**OPERATION RESCUE–NATIONAL a/k/a Operation Rescue, Rescue America, Dallas Rescue, Rev. Phillip L. "Flip" Benham, Bob Jewitt, Don Treshman, and Rev. Keith Tucci, Petitioners,**

v.

**PLANNED PARENTHOOD OF HOUSTON AND SOUTHEAST TEXAS, INC., AAA Concerned Women's Center, Inc., Aaron's Family Planning Clinic of Houston, Inc., A–Z Women's Health Services, P.A., Downtown Women's Center a/k/a Downtown Women's Clinic, et al., Respondents.**

No. 97–0171.

Supreme Court of Texas.

Argued Dec. 2, 1997.

Decided July 3, 1998.

Rehearing Overruled Oct. 15, 1998.

Cactus Jack Cagle, Houston, James Austin Pinedo, San Antonio, Jay Alan Sekulow, Washington, DC, Benjamin W. Bull, Scottsdale, AZ, Richard W. Schmude, Tomball, for Petitioners.

Neal S. Manne, Kathy D. Patrick, Collyn A. Peddie, Houston, for Respondents.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, ENOCH, OWEN, ABBOTT and HANKINSON, Justices, joined.

Petitioners challenge on procedural and constitutional grounds a permanent injunction restricting their anti-abortion demonstrations at certain clinics and residences in Houston. We conclude that portions of the injunction infringe upon petitioners' freedom of expression guaranteed by the First Amendment to the United States Constitution and by Article I, Section 8 of the Texas Constitution. We therefore modify the judgment of the court of appeals.[1]

**I**

Petitioners[2] and others planned to stage massive, concerted demonstrations against

1. 937 S.W.2d 60.

2. Petitioners are Operation Rescue–National, Rescue America, Dallas Rescue, Rev. Philip L. Benham, Bob Jewitt, Don Treshman, and Rev. Keith Tucci.

abortion providers in Houston coincident with the 1992 Republican National Convention there both to protest abortion and to pressure convention delegates to retain a pro-life plank in their party's platform. Petitioners agreed to join together in picketing abortion clinics and the homes of physicians who worked for the clinics. Petitioners also planned blockades and "rescues" designed to shut down clinics by having protesters conduct sit-ins on clinic premises or chain themselves to doors and fixtures. Petitioners were not furtive; demonstration leaders announced their plans at a press conference prior to the Convention.

To forestall these plans, respondents [3] and others—various clinics and physicians targeted by petitioners, plus one business adjacent to Planned Parenthood—obtained a temporary restraining order prohibiting, among other things, demonstrations within 100 feet of the clinics. Soon after the order issued, petitioners Tucci, Benham, and Jewitt, along with four other individuals, intentionally violated the 100–foot buffer zone and were jailed. On their application to this Court for writ of habeas corpus, we ordered them released, holding that the 100–foot buffer zone created by the temporary restraining order violated the protestors' freedom of expression guaranteed by the Texas Constitution.[4]

Meanwhile the district court issued a temporary injunction nearly as restrictive as the temporary restraining order. Among its provisions, the temporary injunction retained the 100–foot buffer zone but allowed four demonstrators to approach to within 25 feet of the clinics' entrances. Additionally, one demonstrator could approach patients going to and from the clinics to talk with them— "sidewalk counsel" in the demonstrators' vernacular—but the demonstrator was required to remain at least 10 feet from the patient unless invited to come closer. The record does not reflect whether the temporary injunction was ever enforced, although many of

the protesters' activities described in the record clearly violated its prohibitions. Petitioners did not appeal the temporary injunction.

More than two years after the convention, the parties proceeded to trial before a jury on respondents' amended pleadings for a permanent injunction and respondent Planned Parenthood's claims for actual and punitive damages. For six weeks respondents offered evidence of petitioners' activities before, during, and after the convention. There was evidence that petitioners demonstrated at all respondents' clinics or residences during the Convention, at times mustering hundreds of protesters. Many of the demonstrations were entirely peaceful, with some protesters picketing the premises while others merely sang, prayed, or preached. At other times, however, demonstrations were more aggressive. Protesters yelled, used bull-horns, and played loud music to disturb people in clinics and homes. Protesters tried to block access to clinics by lying down in front of an entrance en masse, and even invaded the premises and chained their necks to cement blocks or to fixtures within the clinic. Bottles and rocks were thrown at buildings, and locks were glued shut. Although the perpetrators were never identified, several clinics during the convention and afterwards had butyric acid thrown into their offices, permeating the office with a nauseating smell that proved impossible to remove completely.

The protesters did not solely target the premises. Some protesters also acted as "sidewalk counselors", approaching people who drove or walked towards clinics and offering them anti-abortion literature. These encounters were often peaceful efforts to convey information in a helpful, persuasive way, but sometimes protesters were confrontational, coming within inches of patients' faces and shouting at them, causing respondents to have to provide "escorts" to shield

---

**3.** Respondents are Planned Parenthood of Houston and Southeast Texas, Inc.; AAA Concerned Women's Center, Inc.; Aaron's Family Planning Clinic of Houston, Inc.; A–Z Women's Health Services, P.A.; Downtown Women's Center; Houston Women's Clinic, Inc.; Suburban Women's Clinic; West Loop Clinic; Women's Medical

Center of Northwest Houston; Women's Pavilion, Inc.; Dr. Adebeyo Adesomo; Dr. Jerry Edwards; Dr. Robert Kaminsky; Dr. Douglas Karpen; and Dr. Bernard Rosenfeld.

**4.** *Ex Parte Tucci*, 859 S.W.2d 1, 8 (Tex.1993).

patients from protesters. The converging patients, escorts, and demonstrators pushed, prodded, and yelled uncontrollably, creating a chaotic environment. As a result, patients would enter clinics visibly shaken, crying, and nervous. Physicians reported increased respiration, heart rate, and blood pressure among such patients, which at times required sedatives to treat. These symptoms, some of which patients experienced even in the absence of protesters, became more acute when the demonstrations occurred. Additionally, physicians and their families were threatened with serious harm, and at least one shoving match erupted at a physician's home between his family and protesters. All these activities were more frequent during the convention, but some were continuing at the time of trial.

The jury found that petitioners damaged respondents by conspiring to interfere with the clinics' businesses and to violate the physicians' privacy or property rights. The jury also found that petitioners wrongfully interfered with the clinics' ability to provide medical services to existing and prospective patients. The jury found that four petitioners each caused respondent Planned Parenthood $204,585 in compensatory damages, and assessed a total of $1,010,000 in punitive damages. Following a two-day hearing regarding injunctive relief, the district court rendered judgment awarding Planned Parenthood $204,585 jointly and severally as against four petitioners and punitive damages found by the jury, and granting a permanent injunction restricting demonstrations by petitioners. The district court concluded that the injunction would "serve several significant governmental interests", specifically:

a. ensuring that women have access to pregnancy counseling and abortion services;

b. ensuring that clinics can perform abortions safely and without increased medical risks;

c. public safety and order, including the free flow of traffic on public streets and sidewalks;

d. protection of property rights;

e. protection of physicians' residential privacy;

f. ensuring the psychological and physical well-being of patients seeking medical services from the clinics, and;

g. ensuring that competing constitutional rights of groups with differing viewpoints and interests are balanced equitably.

The injunction prohibited petitioners from:

A. Entering without consent upon or damaging any part of the [respondent clinics'] premises, facilities and parking lots....

B. Blocking or attempting to block, barricade, or in any other manner obstruct the entrances to, or the premises of [respondent clinics].

C. Inhibiting, impeding, obstructing or interfering with, or attempting to inhibit, impede, or obstruct or interfere with the free and unmolested ingress and egress of persons (either pedestrian or vehicular) to and from the facilities and parking lots and the streets and sidewalks adjacent to the facilities and parking lots of [respondent clinics].

D. Touching, physically abusing, intimidating, or harassing any individual attempting to enter or exit the facilities or parking lots of [respondent clinics].

E. Demonstrating [defined as publicly displaying, manifesting, or expressing one's feelings or opinions by oral or other expression, including "sidewalk counseling"] within the following areas:

1. Planned Parenthood (3601 Fannin, Houston, Texas)—(a) A zone around the clinic facility (from the easternmost edge of the facility on Berry, along Fannin, and to the easternmost edge of the clinic on Windbern) that extends 26 feet from the edge of the outermost facility structure (building or gate) into the streets of Berry, Fannin and Windbern. (b) A zone 15 feet from either side of the entrance to the Berry street parking lot that extends from the edge of the parking lot across Berry street to the inside edge of the south sidewalk on Berry. (c) A zone around the Fannin parking lot (from the westernmost edge of the lot on Berry around to a point 15 feet south of the Fannin entrance to the lot) that extends from the edge of the

parking lot to the outermost edge of the adjacent sidewalks on Berry and Fannin. (d) A corridor 15 feet wide extending across Fannin (east/west) on the south side on the intersection. See Exhibit "C."

2. Houston Women's Clinic (4820 San Jacinto, Houston, Texas)—A zone around the clinic property (from the westernmost edge of the property on San Jacinto to the northernmost edge of the property on Arbor) extending 17 feet from the property line in to the streets of San Jacinto and Arbor. See Exhibit "D."

3. Downtown Women's Center (2800 San Jacinto, Suite 202, Houston, Texas)—A zone around the clinic property (from the northernmost edge of the property on Tuam, along San Jacinto, to the northernmost edge of the property on Drew) that extends 26 feet from the property line into the streets of Tuam, San Jacinto and Drew. See Exhibit "E."

4. Aaron's Family Planning Clinic of Houston (6420 Hillcroft, Suite 500, Houston, Texas)—A zone in front of the clinic (from the southernmost to the northernmost edges of the property along Hillcroft) extending 19 feet from the property line into the street of Hillcroft. See Exhibit "F."

5. West Loop Clinic, (5607 Schumacher, Houston, Texas)—A zone in front of the clinic (from the easternmost to the westernmost edge of the property on Schumacher) that extends 31 feet from the property line into the street of Schumacher. See Exhibit "G."

6. A–Z Women's Clinic, (5851 Southwest Freeway, Suite 315, Houston, Texas)—(a) A zone on the south side of the property (across the entrance and 15 feet to either side of the entrance on the Southwest Freeway Feeder) that extends 19 feet from the property line into the Southwest Freeway Feeder. (b) A zone on the northern side of the property (across the entrance and 15 feet to either side of the entrance on Westpark) that extends from the property line into the street of Westpark. See Exhibit "H."

7. Womens Medical Center of NW Houston (17070 Red Oak, Suite 505, Houston, Texas)—A zone in front of the clinic (extending from one edge of the property to the other along Red Oak) that extends 32 feet from the property line into the street of Red Oak. See Exhibit "I."

8. Suburban Women's Clinic (3101 Richmond, Suite 250, Houston, Texas)—A zone on the east side of the clinic (from the southernmost edge of the property to the northernmost edge of the property) that extends 24 feet from the property line into the street of Eastside. See Exhibit "J."

9. AAA Concerned Women's Center (7324 Southwest Freeway, Suite 1010A, Houston, Texas)—(a) A zone extending across the entrances and 15 feet to either side of the entrances to the property on Fondren, Bellaire and Southwest Freeway Feeder. (b) A zone across the entrances and extending 15 feet to either side of the entrances to the building containing the clinic. See Exhibit "K."

F. Trespassing on, sitting in, blocking or impeding plaintiff physicians, their family members and their guests or invitees from access to, ingress into or egress from any part of plaintiff physicians' residences;

G. Inhibiting, impeding or attempting to impede or inhibit the free ingress or egress of any person to the streets that provide access to the streets on which the plaintiff physicians' residences are located;

H. Harassing, threatening, assaulting, or physically abusing plaintiff physicians, their family members, guests or invitees;

I. Congregating, picketing, patrolling, or demonstrating within the following areas:

1. Dr. Robert Kaminsky (5014 Huntwick Park)—A zone along the entire Huntwick street edge of plaintiff's property extending 13 feet from the property line into Huntwick street.

2. Dr. Bernard Rosenfeld (6343 Rutgers)—A zone along the entire Rutgers street edge of plaintiff's property extending 13 feet from the property line into Rutgers street.

3. Dr. Jerry Edwards (2913 Cason (house) and 5606 St. Paul (townhouse))—(a) A zone along the entire Cason street edge of plaintiff's property extending 13 feet from the property line into Cason street. (b) A

zone along the entire St. Paul street edge of plaintiff's property extending 13 feet from the property line into St. Paul street.

4. Dr. Douglas Karpen (5340 Cedar Creek)—A zone along the entire Cedar Creek edge of plaintiff's property extending 13 feet from the property line into Cedar Creek street.

5. Dr. Adebayo Adesomo (1463 Sugar Creek Blvd)—A zone along the entire Sugar Creek boulevard edge of plaintiff's property extending 13 feet from the property line into Sugar Creek.

This provision expressly prohibits the placement of any signs, symbols, pictures or other items from being exhibited or erected on plaintiff physicians' property or within the above-designated zones.

J. Congregating, picketing, patrolling or demonstrating in the vicinity of plaintiff physicians' residences for more than 45 minutes in any 24 hour period.

K. Using any sound amplification devices while demonstrating within 100 feet of plaintiff physicians' residences.

(Headings omitted.) Exhibits C–K to the judgment are schematic maps of the premises of each clinic showing the demonstration-free zones.

Petitioners appealed. The court of appeals affirmed the judgment in its entirety.[5] We granted petitioners' application for writ of error.[6] In this Court petitioners complain of the jury charge, the scope of injunctive relief, and the award of punitive damages.

## II

Initially, petitioners complain that the district court defined civil conspiracy incorrectly in the jury charge and refused to inquire of the jury whether petitioners' actions posed imminent harm to respondents. We examine each complaint in turn.

### A

We defined civil conspiracy in *Massey v. Armco Steel Co.*[7] as follows:

An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[8]

The district court in the present case instructed the jury as follows:

"Civil conspiracy" means a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. To find a civil conspiracy, you must find the following:

1. a combination of two or more persons,

2. who agree or have a meeting of the minds on a common purpose or course of action,

3. who have knowledge of the purpose or course of action, and

4. at least one of such persons commits at least one act to further the conspiracy.

"Unlawful" means violative of either criminal or civil law.

Petitioners complain that the district court refused to instruct the jury that the act found to be in furtherance of the conspiracy must be overt and unlawful. We agree that the court erred in omitting these elements from the instruction, but we do not regard the error as harmful. The charge instructed the jury that a civil conspiracy must involve an unlawful purpose or means and defined "unlawful". The evidence was undisputed that petitioners committed overt, unlawful acts, and the jury found that petitioners committed certain wrongful acts—namely, wrongfully violating the respondent physicians' privacy or property rights, and wrongfully interfering with the respondent clinics' ability to provide medical services. There was no evidence or argument that any con-

**5.** 937 S.W.2d 60.

**6.** 40 Tex Sup.Ct. J. 948 (Sept. 4, 1997).

**7.** 652 S.W.2d 932 (Tex.1983).

**8.** *Id.* at 934 (citations omitted).

spiracy among petitioners was confined to lawful means and purposes, or that petitioners' actions in furtherance of the conspiracy were not overt. In view of all these facts, we cannot say that the error in the charge "probably caused the rendition of an improper judgment".[9]

Petitioners also complain that the civil conspiracy definition omitted the element of damages caused by the conspiracy. However, the jury was asked in a separate question to find whether any conspiracy they found proximately caused damages to respondents. The district court did not err in inquiring separately about resulting damages.

### B

■ A prerequisite for injunctive relief is the threat of imminent harm.[10] Petitioners assert that the threat of imminent harm is a fact question for the jury and that the district court, by treating the issue as a question of law, infringed upon petitioners' right to trial by jury as guaranteed by Article I, Section 15 of the Texas Constitution. We have held in *State v. Texas Pet Foods, Inc.*[11] that the question of whether imminent harm exists to warrant injunctive relief is a legal question for the court, not a factual question for the jury. Petitioners attempt to distinguish *Texas Pet Foods* on the ground that the bases for injunctive relief asserted there were statutory. But nothing in our opinion suggests that the threat of imminent harm is a legal question in some instances and a factual one in others. On the contrary, our discussion borrowed language from *Alamo Title Co. v. San Antonio Bar Ass'n*,[12] a case involving a court's equitable powers to grant injunctive relief. In all cases, the determination of imminent harm rests with the court. Thus, the district court did not err in refusing to inquire of the jury whether petitioners threatened imminent harm to respondents.

At oral argument, petitioners also argued that the district court never found imminent harm but found only that "[a]bsent injunctive relief, defendants are *likely* to continue to engage in the tortious conduct found by the jury ... and such conduct is *likely* to cause plaintiff and physicians irreparable harm." (Emphasis added.) Petitioners argue that "likely" is not the equivalent of "imminent". Petitioners have not properly raised this argument in their application for writ of error and thus are not entitled to have it considered.[13]

### III

Petitioners contend that the injunction violates their right to free expression protected by the First Amendment to the United States Constitution and by Article I, Section 8 of the Texas Constitution. We begin our analysis of petitioners' contention by determining the standard for assessing the injunction under each constitutional provision.

### A

■ On the one hand, "'the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process'" and enables individuals to "'make their views known, when, individually, their voices would be faint or lost.'"[14] Such views thus expressed—on issues ranging from race relations, to labor relations, to war, to the environment, to abortion, to the death penalty, to politics—are intended to, and do, provoke strong, emotional disagreement.

[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech

9. Tex.R.App. P. 61.1(a).

10. *Frey v. DeCordova Bend Estates Owners Assoc.*, 647 S.W.2d 246, 248 (Tex.1983).

11. 591 S.W.2d 800, 803 (Tex.1979).

12. 360 S.W.2d 814, 816 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.).

13. *State v. Biggar*, 873 S.W.2d 11, 14 (Tex.1994); *Central Educ. Agency v. George West Indep. Sch. Dist.*, 783 S.W.2d 200, 201 n. 1 (Tex.1989).

14. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907–908, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (citation omitted).

is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.[15]

Communication sometimes requires confrontation. Speech is protected even when the subject or manner of expression is uncomfortable.[16]

■ On the other hand, many interests besides free expression have constitutional protection. Accommodating interests like property and privacy rights along with free expression often necessitates limitations on all of them.

Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; streets and highways and public buildings would cease to be available for the purposes for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes. And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life.[17]

The right to speak does not carry with it a duty on the part of the hearer to listen. The hearer is entitled to the same protection of his rights as the speaker. When "the offer [to communicate] is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation."[18] The difficulty lies in fashioning limitations that balance competing interests properly.

■ The voice seeking audience in this case is that of those who oppose abortion. The conflict is with businesses and individuals who seek to provide abortion services in lawful ways and to enjoy their property and privacy interests as other citizens. The district court was called upon to find the boundary between the two and prevent trespass by one side against the other. That boundary cannot be determined by the subject matter of the dispute, nor can the personal sympathies of judges to one side or the other affect their duty to draw lines. No one issue is entitled to greater access to the public forum than another.[19] "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace *all issues* about which information is needed or appropriate to enable the members of society to cope with the

15. *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (citation omitted).

16. *See Claiborne Hardware Co.,* 458 U.S. at 910, 102 S.Ct. 3409 ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action."); *Thornhill v. Alabama,* 310 U.S. 88, 104–105, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (protecting peaceful labor picketers despite their intent to induce potential customers not to patronize an employer's store); *American Steel Foundries v. Tri–City Cent. Trades Council,* 257 U.S. 184, 204, 42 S.Ct. 72, 66 L.Ed. 189 (1921) ("We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights.").

17. *Gregory v. City of Chicago,* 394 U.S. 111, 125, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring).

18. *American Steel Foundries,* 257 U.S. at 204, 42 S.Ct. 72.

19. *Carey v. Brown,* 447 U.S. 455, 466, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (rejecting the argument that "labor picketing is more deserving of First Amendment protection than are public protests over other issues").

exigencies of their period."[20] The issue here is abortion; in the next case it will be different. The rule of this case must be given application in the next.

## B

Under the facts of this case we start with the First Amendment because it has recently been applied in the very context that here concerns us. The United States Supreme Court has considered two factors in determining the standard by which legislated restrictions on First Amendment freedom of expression are to be measured: whether the forum is public, such as streets, sidewalks, and other public places, and whether the restriction is based on the content of the speech.[21] Content-based statutory restrictions on speech in public forums are strictly scrutinized, and none is permitted by the First Amendment except as necessary to serve a compelling state interest and narrowly drawn to achieve that end.[22] But when the forum is public and the statutory restriction content-neutral, the First Amendment requires a lesser or "intermediate" scrutiny and permits regulation of the time, place, and manner of expression that is narrowly tailored to serve a significant governmental interest and that leaves open ample alternative channels of communication.[23]

In *Madsen v. Women's Health Center, Inc.*[24] the Supreme Court held that the First Amendment imposes a stricter standard on injunctions restricting expression, stating:

> when evaluating a content-neutral injunction, we think that our standard time, place, and manner analysis is not sufficiently rigorous. We must ask instead whether the challenged provisions of the

injunction burden no more speech than necessary to serve a significant government interest.[25]

This standard does not require an elevated government interest—"compelling" rather than "significant". If it did, it would be tantamount to the strict scrutiny standard for content-based restrictions, and the Supreme Court expressly rejected the argument that injunctive restrictions on speech are necessarily content-based.[26] Rather, the standard focuses on the fit between the restriction and the interest served, tightening "narrowly tailored" to "burden no more than necessary". Thus, the Court explained, an injunction restricting speech passes First Amendment scrutiny if it is a " 'precision of regulation' "[27] and employs " 'the narrowest terms that will accomplish the pin-pointed objective' ".[28]

The circumstances in *Madsen* were similar to those in the case before us. There a permanent injunction created a 36-foot buffer zone protecting a clinic that had been targeted by pro-life demonstrators and a 300-foot buffer zone shielding the residences of various physicians who worked at the clinic. The Court upheld the 36-foot buffer zone around the clinic entrances and driveway, excluding all protesters, including "sidewalk counselors", but struck the same buffer zone protecting private property behind and to the side of the clinic because no evidence revealed that the demonstrators' activities had "obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation".[29] The zone around the entrances and driveway was justified by the trial court's finding "that [protest-

---

**20.** *Thornhill*, 310 U.S. at 102, 60 S.Ct. 736 (emphasis added).

**21.** *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

**22.** *Id.* at 45, 103 S.Ct. 948.

**23.** *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

**24.** 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

**25.** *Id.* at 765, 114 S.Ct. 2516.

**26.** *Id.* at 762–763, 114 S.Ct. 2516.

**27.** *Id.* at 767, 114 S.Ct. 2516 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)).

**28.** *Id.* (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 183, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)).

**29.** *Id.* at 771, 114 S.Ct. 2516.

ers] repeatedly had interfered with the free access of patients and staff" to the clinic's driveway entrance.[30] Protesters marching in front of the clinic's driveway would cause approaching cars to slow down, so that sidewalk counselors could approach the vehicles and attempt to give the occupants literature.[31] However, the larger buffer zone surrounding the physicians' residences impermissibly restricted the demonstrators' First Amendment rights by precluding a general march through the residential neighborhood or a walk in front of an entire block of houses.[32] The record did not justify such a broad ban.[33]

Just three years later the Supreme Court applied the *Madsen* standard in another case involving anti-abortion demonstrations, *Schenck v. Pro–Choice Network.*[34] The Court upheld a preliminary injunction that created 15–foot buffer zones around clinics in which abortions were performed but allowed two sidewalk counselors to initiate "non-threatening" conversations with patients within those zones. The Court held that the buffer zones did not burden more speech than necessary to serve significant government interests. The record revealed that protesters had purposefully blocked or hindered access to the clinics, had followed and intimidated patients up to the clinics' doorways, and had harassed police officers responding to confrontations.[35] On this record, the district court was justified in concluding that a restriction against blocking access would be ineffective and that "the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances."[36]

█ Petitioners in the case before us do not contend that the permanent injunction is content-based, and respondents do not deny that the injunction restricts speech in traditionally public areas. Thus, *Madsen* and *Schenck* prescribe the standard for assessing the injunction under the First Amendment: it cannot burden more speech than necessary to serve a significant government interest. The application of this standard in those cases is more troubling because it appears to be influenced by the subject matter of the demonstrations. The Court distinguished between particular modes of speech, such as "sidewalk counseling", fairly unique to anti-abortion demonstrations. Over a decade ago Justice O'Connor, joined by Chief Justice Rehnquist, warned: "This Court's abortion decisions have already worked a major distortion in the Court's constitutional jurisprudence."[37] Justice Scalia, joined by Justice Kennedy and Justice Thomas, echoed the same concern in *Madsen.*[38] While we are, of course, bound to follow *Madsen* and *Schenck,* not only in their general formulations but in their applications as well, we reiterate that constitutional speech guaranties should not vary with the subject of the speech. This is a free speech case, not an abortion picketing case.

### C

█ We next consider the standard under Article I, Section 8 of the Texas Constitution. If it is the same as the First Amendment standard, or if it is less protective of speech, then we need only apply the federal standard. If the state constitutional standard is more protective of speech, then we must determine how to apply it in the context of this case, which involves a balancing of competing and conflicting rights and interests.

---

**30.** *Id.* at 769, 114 S.Ct. 2516.

**31.** *Id.* at 758, 114 S.Ct. 2516.

**32.** *Id.* at 775, 114 S.Ct. 2516.

**33.** *Id.*

**34.** 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).

**35.** *Id.* 117 S.Ct. at 868.

**36.** *Id.*

**37.** *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 814, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting).

**38.** 512 U.S. 753, 785, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (Scalia, J., concurring in part and dissenting in part).

In two cases, *Davenport v. Garcia*[39] and *Ex Parte Tucci*,[40] this Court has said that Article I, Section 8 of the Texas Constitution is "broader" or affords "greater" protection of speech than the First Amendment.[41] In neither case, however, did the Court actually apply a different standard under the state constitutional provision than required by the First Amendment.

*Davenport* involved a content-specific gag order that the trial court imposed on a guardian ad litem in pending civil litigation. This Court concluded that the First Amendment standard for reviewing such an order had not been clearly defined in federal case law and adopted its own test under Article I, Section 8.[42] But even if federal law was unclear, the state standard enunciated by the Court did not conflict with federal law.[43] The Court did not reject a federal standard as inadequate for the state constitutional protection. In any event, because *Davenport* dealt with a content-based restriction, it provides no guidance to us here.

*Tucci*, it so happens, arose out of the same litigation before us today. As already explained above, relators in that case, some of whom are petitioners here, were held in contempt for violating the district court's temporary restraining order. The Court unanimously agreed that the order violated relators' rights under Article I, Section 8 of the Texas Constitution. Five Justices expressed the view that this provision provides greater protection of speech than the First Amendment.[44] But this majority could not agree on the applicable standard. At the time, *Madsen* had not been decided. Four members of this Court rejected what they believed to be the applicable First Amend-

ment standard—the "time, place, and manner" test of *Ward* and *Perry*—the standard the Supreme Court had applied to legislative restrictions. Writing for this plurality, JUSTICE DOGGETT expressed the view that under Article I, Section 8, "[r]estraints [on speech] may be imposed only if the injunctive relief granted encompasses the least restrictive means of protecting against" imminent and irreparable harm.[45] JUSTICE GONZALEZ applied a modified "time, place, and manner" test, allowing content-neutral restrictions narrowly tailored to serve government interests that are not merely significant, as required by *Ward* and *Perry*, but compelling.[46] JUSTICE GONZALEZ regarded his test as more protective than the federal test but less protective than JUSTICE DOGGETT's "least restrictive means" test.[47] The other four Justices applied the First Amendment standard prescribed in *Ward* and *Perry* without change.[48]

In *Tucci*, this Court misunderstood the First Amendment test for injunctive restrictions on speech, as we now know from *Madsen*. JUSTICE DOGGETT and JUSTICE GONZALEZ argued for state constitutional standards that are more protective of speech than the intermediate scrutiny of statutory restrictions required by *Ward* and *Perry*, but it is not clear how either of those standards compares with *Madsen*.

JUSTICE GONZALEZ's test requires that injunctive relief serve a higher interest than *Madsen*—compelling rather than significant—but allows a looser fit between the relief and the interest—narrowly tailored rather than no more burden than necessary. The requirement of a compelling government interest resembles the strict scrutiny re-

**39.** 834 S.W.2d 4 (Tex.1992).

**40.** 859 S.W.2d 1 (Tex.1993).

**41.** *Davenport*, 834 S.W.2d at 10 ("[A]rticle one, section eight of the Texas Constitution provides greater rights of free expression than its federal equivalent."); *Tucci*, 859 S.W.2d at 5 (Doggett, J., plurality opinion) (quoting *Davenport*); *id.* at 62 (Gonzalez, J., concurring) ("[T]he free speech guarantees of the Texas Constitution are greater than the guarantees provided by the First Amendment.").

**42.** *Davenport*, 834 S.W.2d at 10–11.

**43.** *Id.* at 36–37 (Hecht, J., concurring in the judgment).

**44.** *Tucci*, 859 S.W.2d at 5 (Doggett, J., plurality opinion), *id.* at 62 (Gonzalez, J., concurring).

**45.** *Id.* at 6 (Doggett, J., plurality opinion).

**46.** *Id.* at 62–63 (Gonzalez, J., concurring).

**47.** *Id.* at 61–62.

**48.** *Id.* at 34–35 (Phillips, C.J., concurring); *id.* at 64 (Hecht, J., dissenting).

served for content-based restrictions, but JUSTICE GONZALEZ did not argue for strict scrutiny. On the contrary, he viewed his standard as less demanding than JUSTICE DOGGETT's. Thus, both JUSTICE GONZALEZ's test and the *Madsen* test fall between the federal strict scrutiny and intermediate scrutiny standards. If they operate differently, it is not clear how.

The "least restrictive means" component of JUSTICE DOGGETT's test is indistinguishable from the "burden no more speech than necessary" element of the *Madsen* test. Under either formulation, the goal is to protect the interests at stake while minimizing the speech proscribed. An injunction that safeguards relevant interests by excessively proscribing speech would not only burden speech more than necessary, but would not be the least restrictive means available. But it is not clear how JUSTICE DOGGETT's requirement that restrictions be used only to protect against imminent and irreparable harm compares to *Madsen*'s requirement that restrictions must serve a significant government interest. The threat of irreparable harm is necessary for issuance of an injunction under federal law,[49] and is therefore implicit in the *Madsen* test. No injunction can issue except to protect against imminent harm. It thus appears that the *Madsen* test contains both the elements in JUSTICE DOGGETT's test and adds a significant-government-interest limitation missing from JUSTICE DOGGETT's test.

But if the *Madsen* test is more protective of speech than JUSTICE DOGGETT's test in *Tucci*, then it is perforce more protective than JUSTICE GONZALEZ's test, belying both their assertions that Article I, Section 8 is more protective of speech than the First Amendment. On the other hand, if the *Madsen* test is less protective than both the others, even though it is more protective than federal intermediate scrutiny, then the differences are too minuscule to matter.

Three Justices in *Madsen* found the test adopted by the Court indistinguishable from intermediate scrutiny.[50] The notion that not one, but three different tests can be formulated and applied in between traditional federal intermediate scrutiny and strict scrutiny presupposes a continuum more metaphysical than legal.

It is possible that Article I, Section 8 may be more protective of speech in some instances than the First Amendment,[51] but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because.* Starting from the premise that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards. To define the protections of Article I, Section 8 simply as one notch above First Amendment protections is to deny state constitutional guarantees any principled moorings whatever. We reject this approach.

The text, history, and purposes of Article I, Section 8 have been thoroughly examined by this Court.[52] We know of nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment. We are concerned that the fact that an injunction suit necessarily focuses on particular speech in particular circumstances makes it difficult to consider relief without regard to the content of the speech involved. The predilections JUSTICE GONZALEZ expresses today illustrate this concern.[53] The danger is more acute in litigation than in the more abstract and removed legislative process. We are also concerned that injunctive restrictions on speech are the product of a single judge, whereas legislative restrictions are the product of the people's representatives. We are therefore persuaded, as the Supreme Court has been, that injunctive restrictions must be judged more strictly than legislative restrictions, but like the Supreme

**49.** *Schenck,* 519 U.S. at ——, 117 S.Ct. at 862.

**50.** *Madsen,* 512 U.S. at 791, 114 S.Ct. 2516 (Scalia, J., concurring and dissenting).

**51.** *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex. 1989).

**52.** *Davenport,* 834 S.W.2d at 30–35 (Hecht, J., concurring); *Tucci,* 859 S.W.2d at 16–32 (Phillips, C.J., concurring).

**53.** *Post* at 573.

Court, we hesitate to apply the same strict scrutiny to content-neutral injunctions as is applied to content-based statutes.

The considerations relevant to determining the protection to be afforded speech in the present context are the same under both the federal and state constitutions. Accordingly, we conclude, as the Supreme Court has in *Madsen* and *Schenck*, that an injunction in these circumstances must burden no more speech than necessary to serve a significant government interest.

## IV

Having determined the applicable constitutional standard, we now apply it to the injunction in this case.

### A

■■■■ A trial court's issuance of injunctive relief is reviewable for abuse of discretion.[54] Of course, a trial court has no discretion to grant injunctive relief violative of constitutional guarantees [55] or without supporting evidence.[56] But a trial court has some latitude in fashioning the details of appropriate relief. The Supreme Court stated in *Madsen*: "The need for a complete buffer zone near the clinic entrances and driveway may be debatable, but some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." [57] It reiterated in *Schenck*: "Although one might quibble about whether 15 feet is too great or too small a distance [from a clinic entrance for a buffer

zone] if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear." [58] We likewise will not second-guess the trial court on whether a 20–foot buffer zone would be more appropriate than a 19–foot or 21–foot buffer zone. Rather, we examine the entire record to determine whether any buffer zone burdened more speech than necessary, and whether the zone created by the trial court was within reason.

■■■■ Although it is unreasonable to expect that the evidence will dictate the size of any buffer zone down to the foot, the record must contain evidence supporting each injunctive provision. We agree with the plurality in *Tucci* that every restraint must be "justified by a proper evidentiary showing that such measures are essential to preserve the right of clinic access, and that each satisfies fully the standard we have required under the Texas Constitution." [59] The Supreme Court followed a similar path in *Madsen* and *Schenck*.[60] A trial court's discretion in fashioning the details of an injunctive provision does not extend to determining whether particular kinds of relief are justified.

■■■■ Also, when a permanent injunction restricts speech at multiple locations, the record must reflect the need for the injunction at each location. In *Tucci*, the Court criticized the practice of applying uniform buffer zones at multiple clinics in the name of "ad-

---

54. *Clark v. Salinas*, 628 S.W.2d 51, 51 (Tex.1982) (per curiam); *Big Three Indus., Inc. v. Railroad Comm'n*, 618 S.W.2d 543, 548–549 (Tex.1981); *Repka v. American Nat'l Ins. Co.*, 143 Tex. 542, 186 S.W.2d 977, 981 (1945).

55. *Tucci*, 859 S.W.2d at 6 (Doggett, J., plurality opinion); *Star–Telegram, Inc. v. Walker*, 834 S.W.2d 54, 58 (Tex.1992) (holding that the trial court abused its discretion by issuing a protective order that violated Article I, section 8 of the Texas Constitution).

56. *Tucci*, 859 S.W.2d at 6 (Doggett, J., plurality opinion); *City of Houston v. Southwestern Bell Tel. Co.*, 263 S.W.2d 169, 171 (Tex.Civ.App.— Galveston 1953, writ ref'd) (stating that an abuse of discretion occurs "when the record reflects

that the findings of the trial court necessary to sustain its order are not supported by some evidence").

57. 512 U.S. at 769–770, 114 S.Ct. 2516.

58. 519 U.S. at ——, 117 S.Ct. at 868–869.

59. *Tucci*, 859 S.W.2d at 7 (Doggett, J., plurality opinion).

60. *Madsen*, 512 U.S. at 768, 114 S.Ct. 2516 ("We now examine each contested provision."); *Schenck*, 519 U.S. at ——, 117 S.Ct. at 865–869 (considering, each in turn, a floating buffer zone around individuals, a floating buffer zone around vehicles, and a fixed buffer zone around the clinic).

ministrative convenience".[61] While the occurrence of similar activities at similar locations argues for similar relief, the evidence must support both the kind of relief granted and the specifics at each location.

■ Courts reviewing injunctions under the *Madsen* standard have considered significantly diverse evidentiary records.[62] The evidence considered by these courts includes geographical information, the demonstrators' past and continuing activities, past injunctive efforts, alternative means of communication remaining under the injunction, and site visits by the trial court. A party seeking injunctive relief need not produce every form of evidence possible, but the evidence must support the propriety of each element of relief.

■ However, a conspiracy finding obviates the necessity of demonstrating the propriety of injunctive relief against each co-conspirator at every location the person could appear. Co-conspirators are " 'responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.' "[63] If one person's conduct at a particular site can be enjoined, the same conduct by co-conspirators at the same site can likewise be enjoined. On the other hand, enjoining conduct at one site does not justify imposing the same restrictions at other sites. Whether restrictions burden more speech than necessary must be determined separately at each location, based on at least one co-conspirator's conduct.

## B

Petitioners do not argue that the government interests identified by the district court to be protected by its injunction are not "significant", as required by the standard prescribed in *Madsen*. The Supreme Court has held similar interests sufficiently significant to warrant injunctive protection.[64]

■ Petitioners argue three reasons why the permanent injunction infringes upon their constitutionally protected speech: first, that the district court failed to make specific findings justifying the speech-free zones at each clinic; second, that no evidence proves that the permanent injunction burdened no more speech than necessary; and third, that the injunction is overbroad because it limits peaceful communication within speech-free zones, such as sidewalk counseling and prayer that do not interfere with the government's interests. Respondents answer that petitioners have waived any evidentiary challenge by failing to request more specific findings of fact. But all petitioners have waived is any complaint as to the specificity of the district court's findings; they have not waived their complaint that the findings have no supporting evidence.[65]

■ Respondents also argue that petitioners seek a factual sufficiency review beyond this Court's jurisdiction. Again we disagree. Petitioners' argument, which we address, is that the record shows that the

**61.** 859 S.W.2d at 6 (Doggett, J., plurality opinion) (" '[T]he argument of convenience can have no weight as against [the] safeguards of the constitution.' ") (quoting *Ex parte McCormick*, 129 Tex.Crim. 457, 88 S.W.2d 104, 107 (1935)); *id.* at 35–36 (Phillips, C.J., concurring) (agreeing that the trial court wrongfully generalized in the name of "administrative convenience").

**62.** *See Schenck*, 519 U.S. at ——, 117 S.Ct. at 855; *Madsen*, 512 U.S. at 753, 114 S.Ct. 2516; *Lucero v. Trosch*, 121 F.3d 591 (11th Cir.1997); *National Org. for Women v. Operation Rescue*, 37 F.3d 646 (D.C.Cir.1994); *Planned Parenthood Shasta–Diablo, Inc. v. Williams*, 10 Cal.4th 1009, 43 Cal.Rptr.2d 88, 898 P.2d 402 (1995); *Planned Parenthood League, Inc. v. Bell*, 424 Mass. 573, 677 N.E.2d 204 (1997); *Murray v. Lawson*, 138 N.J. 206, 649 A.2d 1253 (1994); *United States v. Scott*, 958 F.Supp. 761 (D.Conn.1997); *United States v. McMillan*, 946 F.Supp. 1254 (S.D.Miss.

1995); *United States v. Lindgren*, 883 F.Supp. 1321 (D.N.D.1995); *Planned Parenthood Assoc. v. Operation Rescue*, 50 Cal.App.4th 290, 57 Cal. Rptr.2d 736 (1996); *Feminist Women's Health Ctr. v. Blythe*, 32 Cal.App.4th 1641, 39 Cal. Rptr.2d 189 (1995); *Horizon Health Ctr. v. Felicissimo*, 282 N.J.Super. 323, 659 A.2d 1387 (N.J.Super.Ct.App.Div.1995).

**63.** *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979) (quoting *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 559 (1937)).

**64.** *Schenck*, 519 U.S. at ——, ——, 117 S.Ct. at 866, 868.

**65.** *Tarrant County Water Control and Improvement Dist. Number One v. Haupt, Inc.*, 854 S.W.2d 909, 913 (Tex.1993); *Lindner v. Hill*, 691 S.W.2d 590, 592 (Tex.1985).

562

district court abused its discretion in fashioning the particular types of relief and the various buffer zones. Petitioners stipulated to the introduction of photographs and maps for each location with the proposed buffer zones marked, but they did not agree that the injunction's provisions burdened their speech no more than necessary to protect the government's interests.

Thus, we consider "the injury asserted, the relief requested, and the underlying evidence." [66] We first review the evidence common to all locations, and then we review the evidence pertaining to each different location.

### C

The court of appeals concluded that the buffer zones created by the injunction around each clinic did not violate petitioners' constitutional rights because the zones were "narrower than the 36-foot zone upheld in *Madsen*", and each had been "specifically tailored to the geography of the particular clinic." [67] As examples, the court noted that the buffer zones at the Planned Parenthood Clinic, the A–Z Women's Clinic, and the West Loop Clinic were shaped to fit each location's unique geography. A complete speech-free zone was justified, according to the court, because *Madsen* also "upheld a complete ban on 'demonstrating' within a 36-foot 'speech-free' zone".[68]

The appeals court's analysis was flawed in two respects. First, it overlooked the threshold inquiry whether any buffer zone was necessary at all. Instead, the court began its analysis by considering whether the buffer zones were narrowly tailored to further significant government interests. In effect, the court presumed that those interests could be adequately protected only by buffer zones rather than by less burdensome means, such as the unchallenged injunctive prohibitions against trespassing, blocking the premises, inhibiting access, and harassing patients. Second, and relatedly, the court seemed to assume that buffer zones no larger than those approved in *Madsen* are automatically constitutional. *Madsen* does not give blanket approval to the use of buffer zones to restrict demonstrations. The buffer zones in *Madsen* were justified by the evidence in that case; the buffer zones in this case can be justified only if there is evidence to meet the constitutional standard—that such injunctive relief burdens no more speech than necessary at each specific location.

We have reviewed the record ourselves to determine whether the constitutional standard was violated. To justify creating demonstration-free zones, the clinics relied on the testimony of two psychologists. One, Dr. Taggart, claimed that close-proximity protesting, including leaflet distribution, traumatized patients and staff members. He recommended that a "cordon sanitaire" be created around any clinic which offered abortions and at which close-proximity protesting might occur. The other witness, Dr. Dale Hill, agreed that the demonstrations caused lingering fear and stress among patients and staff members, and that a buffer zone was necessary to avoid continued emotional abuse. According to Hill, patients and staff members were alarmed even by walking past demonstrators doing nothing more than praying silently on the sidewalk because violence against abortion providers across the country created apprehension about demonstrators' intentions in all circumstances. Dr. Taggart and Dr. Hill based their views on interviews they conducted with Planned Parenthood's patients, volunteers, and staff members. The two experts admitted that they did not know whether these interviews were a representative sample.

In response, petitioners offered the testimony of Mary Hall Kleypas, a sidewalk counselor. She explained that sidewalk counselors attempted to offer the clinics' potential patients information regarding alternatives to abortion, and to persuade these women to choose an alternative. To accomplish these goals, Kleypass stated, sidewalk counselors had to approach the women in a quiet, non-threatening manner. Effective sidewalk

66. *Tucci,* 859 S.W.2d at 6 (Doggett, J., plurality opinion).

67. 937 S.W.2d at 80.

68. 937 S.W.2d at 81.

counseling was impossible, she believed, if the only means of communication was yelling across a street.

Besides this testimony, the evidence before the district court included extensive testimony about the activities of demonstrators at the various locations since the convention, videotapes showing some of the demonstrations, photographs of every clinic taken from numerous angles, including aerial shots, and maps of each location indicating the proposed buffer zone. To determine whether the buffer zones were appropriate, we examine the evidence regarding each site in detail.

## 1

██ Planned Parenthood Clinic is a long, three-story building with a single doorway facing Fannin Street, a four-lane, one-way thoroughfare. A pair of two-lane streets, Berry and Windbern, flank the clinic, and a fence protects the entire complex. Parking is available only in lots situated across Fannin and Berry streets, although a driveway leads directly to the doorway. Visitors enter the driveway on Fannin Street and exit onto Berry Street. One other entrance, on Windbern Street, is used only for supplies. The buffer zone encompassed the sidewalks and one lane of traffic on the clinic's three exposed sides. The injunction also created demonstration-free corridors leading to and extending several feet on either side of the parking lot entrances.

Demonstrators continued to target Planned Parenthood from the convention through the trial, at times violating the temporary injunction. For example, one employee testified that during the trial a protestor had followed him to the parking lot and threatened, "This is your day to die, brother." Another witness testified that demonstrators attempted to block access to the clinic and came within inches of the patients and staff members, occasionally contacting them. A video also depicted protesters during the Republican Convention at Planned Parenthood's doorway blocking the entrance by sitting down. There was evidence that the protesters could be heard from within the clinic and interfered with its operations.

This evidence demonstrates the need for some form of buffer zone to provide unhindered access to the clinic and to protect the clinic's operations from interference occasioned by the protesters' noise. Because the demonstrators had shown a propensity to block each entrance, the trial court could conclude that its only remaining option was to place the demonstrators away from any entrance and from the patients and staff members. Moving the protesters across the street from Planned Parenthood also decreased the likelihood that their noise level would interfere with the clinic's operations. Given that the temporary injunction's restriction on sound levels had proved ineffective, the district court could resort to stronger measures. The evidence also justified extending a buffer zone to the parking lots. Although a driveway existed, some patients and staff members used the parking lots and were harmed when they were improperly accosted on the way to the building.

The evidence also showed that alternative means of communication were preserved. Protesters could situate themselves on sidewalks across the street from the clinic, where signs could still be read from the clinic's fence and probably from the clinic itself. Protesters could also stand relatively close to the parking lot entrances, enabling them to communicate verbally with patients and staff members who parked within the lots.

The evidence failed to demonstrate, however, that a *complete* buffer zone was necessary to further government interests. Several witnesses testified that patients and staff members were harangued, yelled at, jostled, and dogged by protesters. These tactics are prohibited by sections "C" and "D" of the permanent injunction, neither of which Operation Rescue challenges. Section E, however, prohibits sidewalk counseling and any expression "that publicly displays, manifests, or expresses one's feelings or opinions", thereby precluding praying or the inoffensive distribution of literature. Two sidewalk counselors testified that their activities were peaceful and unobtrusive; indeed, to be successful, they stated, sidewalk counselors could not frighten people away. No evidence indicated that this form of sidewalk

counseling harmed patients. The harm Dr. Taggart and Dr. Hill described was from more aggressive conduct; Dr. Taggart even acknowledged he was unaware of sidewalk counselors' activities. Judy Reiner, Planned Parenthood's director, stated that the clinic did not object to members of a church group talking to patients entering and leaving the clinic "if they quietly handed out material and did not try to block the clients' access to the clinic or scream and holler or harass them in any way." Protecting the health and safety of clinic patients is, of course, a legitimate state interest that justifies limitations on threatening conduct. But the threat must come from the demonstrators' conduct and not merely from their speech.[69]

From the record we are forced to conclude that the complete buffer zone burdened more speech than necessary by proscribing peaceful conduct. We consider what specific modifications are necessary in Part III–C–10 below.

### 2

■ The Houston Women's Clinic is on a square plot at the junction of San Jacinto and Arbor Streets. The building stands in the corner farthest from the intersection, and a parking lot occupies the remainder of the land. Bordering the parking lot is a wooden fence that allows access only through gated entrances on both streets. The permanent injunction covers the length of the fence (a sidewalk exists only on San Jacinto) and extends about one traffic lane into San Jacinto and Arbor Streets. San Jacinto is a four-lane street, while Arbor Street is narrower.

The evidence reflects that demonstrations occurred at this clinic every Saturday. A physician testified that protesters screamed at the patients and at him, causing stress amongst the patients and making the abortion procedure more dangerous. According to his testimony, the demonstrations caused some patients to reschedule their visits.

The evidence supports the conclusion that a buffer zone would burden no more speech than necessary by keeping the demonstrators' noise levels from interfering with the

clinic's operations and by ensuring that the demonstrations did not increase the medical risks of abortions and other procedures performed at the clinic. Given that the temporary injunction prohibition against loud and amplified noises had not proved effective, the district court could conclude that maintaining distance between the protesters and the clinic's property was the only way to minimize the impact of the demonstrators' noise. Although signs positioned across San Jacinto Street may not be readable from the doorway of the clinic, protesters across the narrower Arbor Street, relatively close to the main parking area, could easily be seen, thus preserving some alternative means of communication.

However, as with the Planned Parenthood clinic, the evidence did not demonstrate that peaceful communication by a limited number of demonstrators within the buffer zone would infringe upon the patients' and clinic's protected rights. The adjacent parking lot enables any person accessing the building to do so without stepping foot on public property. Thus, paragraph E(2) of the permanent injunction must be modified.

### 3

■ The West Loop Clinic is a rectangular building 20 to 30 feet from Schumacher Street, the one road that borders it. No sidewalk or marked entrance leads from the street across the pavement and parking spaces to the doorway of the clinic facing Schumacher. The parking lot extends around two other sides of the building, and the fourth side rests against other buildings. The permanent injunction creates a buffer zone from the doorway to the near lane of Schumacher, a two-lane street.

Numerous demonstrations occurred at the West Loop Clinic in 1993. Two witnesses testified that petitioner Treshman entered the clinic sometime after the Republican Convention.

Demonstrators standing between the street and the front entrance would necessarily be blocking access to the parking there. The only area where protesters could stand

**69.** *See Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

without potentially interfering with clinic visitors and staff members was next to the clinic's property. The injunction does not exclude protesters from this adjacent area even though demonstrators positioned there would be relatively close (roughly two car lengths) to anyone parking near the doorway. Protesters across Schumacher Street would also be near the clinic, given the street's narrow width. Photographs revealed that signs positioned outside the buffer zone could be read from the clinic's doorway. This evidence shows that the buffer zone in removing the protesters en masse burdened no more speech than necessary.

At the same time, the complete buffer zone burdened more speech than necessary because allowing a limited number of demonstrators within the buffer zone subject to the restrictions imposed by the permanent injunction's provisions would not infringe upon the government interests. Although numerous demonstrators would likely hinder access to the clinic's parking lot, two persons could easily remove themselves from the path of an oncoming vehicle. Or, given that the area fronting the clinic has no marked entrance, a vehicle easily could maneuver around a couple of stationary demonstrators. We reiterate that the unchallenged injunctive provisions would prohibit these demonstrators from purposefully moving into the path of a car accessing the clinic. Also, no demonstrator could enter the clinic's parking lot in order to counsel an individual. With these restrictions in mind, paragraph E(5) of the permanent injunction must be modified.

4

▆ The Women's Medical Center is a multi-story rectangular building built perpendicular to Red Oak, the only street that the center touches. In contrast to the West Loop Clinic, however, the Women's Medical Center's doorway is removed from the street and faces a large adjoining parking lot, which can be accessed via Red Oak. A fence running parallel to this street protects the clinic, and between the fence and the street is a grassy area containing a large ditch. Between the clinic's property and the street there are only a few feet of level ground on

which to stand. The trial court tailored the permanent injunction to include this grassy area and one lane of Red Oak.

The evidence reflects that protesters disrupted the clinic's operations in April 1994 by invading the clinic and picketing on the street. According to the testimony, the picketers "continuously walked across the entrance to the parking lot trying to impede cars entering the parking lot, showing signs, putting signs right up to the windows of people coming into the parking lot." Picketing has occurred regularly at the clinic since 1979.

The injunction creates a buffer zone from the property into one lane of Red Oak. Protesters on the same side of Red Oak Street as the clinic would attempt to impede cars entering the parking lot, despite a temporary injunction prohibiting such activity. The trial court could conclude that moving the group of protesters across the street was the sole means available to ensure unobstructed ingress into and egress from the clinic. Additionally, Red Oak Street is relatively narrow; protesters positioned outside the buffer zone would not be far removed and could continue to communicate verbally and with signs. This evidence demonstrates that some form of buffer zone burdened no more speech than necessary to ensure access to the clinic.

However, for many of the same reasons discussed with respect to the previous clinics, the evidence concerning the Women's Medical Center fails to support a complete buffer zone. No evidence indicated that peaceful, quiet protesting by only two persons would impair the government interests. Rather, the complaints were directed at large, boisterous groups of protesters blocking access to the clinic and engaging in other disruptive behavior; these tactics remain prohibited by the permanent injunction. The permanent injunction must be modified to allow other speech.

5

▆ The Downtown Women's Center occupies an office in the middle of a long, multi-story complex used by several businesses. Visitors and staff members park in an adja-

cent lot running the length of the building and enter the center on the ground level. Three streets border the facility: San Jacinto Street in front, and Taum and Drew Streets on the sides. Drew Street has two lanes; the other two streets have four. Between the parking lot and these streets lies only a sidewalk broken by entrances on every side. The buffer zone includes this sidewalk and one traffic lane on all three streets.

The Women's Center had its locks glued six times between 1992 and 1994, and it was the target of a stink bomb attack after the Republican Convention. Demonstrators thrice blockaded the clinic with over 100 participants, most recently within a year of trial. There was evidence that the blockades and protests caused psychological harm to patients and staff members.

In contrast to the previous four clinics, the evidence does not indicate that any buffer zone protecting the Houston Women's Center burdened no more speech than necessary to protect the government interests. The demonstrators' activities obviously interfered with the center's operations. However, the evidence concerned only physical invasions of the clinic's private property. No evidence indicated that demonstrators had blocked the parking lot entrances or that their activities along the sidewalks had caused any harm. Removing the demonstrators across the street did not lessen the possibility of a future stink-bomb attack or blockade, which are prohibited by unchallenged provisions of the injunction. The buffer zone does almost nothing to further significant government interests and severely curtails peaceful demonstrators' speech. The injunction should not have included this buffer zone.

### 6

∎ Aaron's Family Planning Clinic is a multi-story elongated building perpendicular to Hillcroft Street. Landscaping decorates the area between the clinic's doorway and the street, while entrances to two parking lots exist on either side of the building. Hillcroft, the only street near the clinic, has six lanes separated by a wide grassy median. The buffer zone includes the sidewalk in front of the clinic's property, extending approximately one traffic lane into Hillcroft Street.

The only evidence concerning this clinic is that it was blockaded one time after 1992, when numerous protesters entered the building to obstruct the clinic's operations. This does not support the buffer zone imposed by the injunction, nor any buffer zone whatsoever. The one incident of trespass does not justify moving the protesters across the street where they could hardly be seen or heard. The record contains no evidence that a buffer zone would further a government interest not served by other injunctive provisions. The buffer zone thus burdened more speech than necessary and should not have been included in the injunction.

### 7

∎ The Suburban Women's Clinic is located at the intersection of Eastside and Richmond streets. The clinic's longer side is parallel to Richmond Street and contains a doorway. Between this doorway and Richmond is the clinic's main parking lot, accessible via Eastside Street. A second entrance exists on Eastside leading to a parking lot behind the clinic. Between these two entrances lies a narrow grassy area crossed by a sidewalk. The buffer zone runs the length of this sidewalk, reaching some feet beyond each entrance, and protrudes approximately one lane into Eastside Street. The permanent injunction does not prohibit demonstrators from standing on the sidewalk parallel to Richmond Street.

The evidence reflected that the clinic had not been the site of demonstrations since the Republican Convention, when protestors blocked the clinic's entrance. Although the injunction prohibited demonstrators from standing only on the sidewalk between entrances to the clinic's parking lots, the record does not demonstrate that any buffer zone, even a limited one, burdened no more speech than necessary. Demonstrations on the sidewalk would not hinder access to the clinic or otherwise interfere with its operations. This buffer zone should not have been included in the injunction.

### 8

██ The A–Z Women's Clinic, an irregularly shaped building, occupies a large parcel of land along with a parking garage. Visitors can access the clinic's property from Westpark Street or the Southwest Freeway Feeder Road. The injunction creates a buffer zone including only the sidewalks within fifteen feet of either entrance and the entrances themselves, and extending outward about one traffic lane.

Various witnesses recalled petitioners' activities in August 1992, including a blockade, a pushing incident, and the stalking of an employee. A video of a demonstration at the clinic depicted petitioner Ross receiving a copy of the temporary injunction then in effect. In fielding questions regarding his view of court orders, Ross testified that he would continue breaking "man's law" if he deemed it "inconsistent with God's law".

The record does not demonstrate that the buffer zone, albeit small, burdened no more speech than necessary. Any person visiting the A–Z Women's Clinic, either as an employee or a patient, could enter the clinic's property, park in the adjacent lot, and walk to the doorway without ever coming near a protester. No evidence indicated that demonstrators blocked either entrance to the clinic's property. There is simply nothing to show that any buffer zone was necessary, and it should not have been included in the injunction.

### 9

██ The AAA Concerned Women's Center occupies an office in a high-rise building that forms part of a larger business complex along with a twin high-rise building, a dome-shaped structure, and various parking lots, driveways, and entrances. Visitors can access the complex from any of three bordering streets. The buffer zone included these entrances, as well as the area surrounding the doorway to the building containing the clinic.

Several witnesses testified about an invasion of this clinic during the Convention and of protests at the clinic shortly thereafter. But there is no evidence of interference with the clinic's operations after the Convention. The evidence thus fails to demonstrate that a buffer zone burdens no more speech than necessary to ensure access to the clinic. Except for one incident during the Convention, there is no evidence that demonstrators hindered a patient's or staff member's access to the clinic. Unchallenged provisions of the permanent injunction prohibit demonstrators from entering the parking lots that adjoin the building's doorways. As a result, even without a buffer zone, patients and staff members can access the clinic without coming into close proximity of demonstrators. A buffer zone provides no necessary protection and merely proscribes additional areas where demonstrators can voice their views. One should not have been included in the injunction.

### 10

We therefore conclude that the permanent injunction must be modified to delete paragraphs E(3), E(4), E(6), E(8), and E(9), and add a proviso as follows:

E. Demonstrating within the following areas, except as provided in paragraph 10:

\* \* \*

10. No more than two demonstrators may be present within a zone. They may not yell, shout, or speak above a normal speaking voice, and may not use any sound amplification device. They may "sidewalk counsel", but no more than one demonstrator may counsel or attempt to counsel a person or group of persons at a time, and no person or group of persons may be approached more than once going into the clinic and once going out. The demonstrator must stop counseling and retreat when a targeted person verbally indicates a desire to be left alone.

This modification protects the demonstrators' right to engage in peaceful speech. At the same time, the provision ensures that the demonstrators will not interfere with the significant government interests protected by the buffer zone. The limitations imposed by paragraph E(10) on the number of demonstrators and their activities precludes the negative impact occasioned by large groups of boisterous demonstrators or by a few

handful who approach patients in a threatening manner and proceed to shout and otherwise harangue them.

### D

Finally, we consider the injunction's restrictions on demonstrations near respondent physicians' residences. In *Valenzuela v. Aquino*,[70] we considered whether residential picketing could constitute actionable breach of privacy, but we have never considered whether such picketing could be constitutionally restricted by injunction. The government has a greater interest in restricting demonstrations directed at specific residences than it does when the demonstrations are directed to business or other public locations. In *Frisby v. Schultz*,[71] the Supreme Court held that while demonstrations could not be completely prohibited in residential areas, an ordinance banning picketing focused on a specific residence was valid. The Court explained:

> The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectionable speech. The target of the focused picketing banned by the Brookfield ordinance is just such a "captive." The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech. Thus, the "evil" of targeted residential picketing, "the very presence of an unwelcome visitor at the home," is "created by the medium of expression itself."[72]

Because the government has a greater interest in protecting a resident from picketing targeted at his or her home, the means of affording such protection may intrude further on freedom of expression.

### 1

Dr. Adesomo admitted in testimony that demonstrators had never picketed at his home and had never stalked him. There is no evidence that petitioners ever planned to demonstrate in front of Dr. Adesomo's home. Thus, the evidence does not support the imposition of a buffer zone preventing demonstrations in front of his residence. The injunction must be modified to delete paragraph I(5).

### 2

Each of the other four respondent physicians testified regarding demonstrations at his respective residence. Dr. Kaminsky claimed that two protesters targeted him every two to three weeks, that his family was followed daily, and that his home had been picketed most recently two days before his testimony. He further recalled that the protesters shouted at passersby, and had in June 1993 been involved in a shoving match with his wife when she tried to pick up crosses that protesters had placed in front of his home (it was disputed whether the crosses were placed on the public easement or on the Kaminskys' property). Petitioner Mahoney admitted telling Dr. Kaminsky that he could not hide from the protests. Dr. Rosenfeld testified that his home had been picketed half a dozen times, with protesters blocking his driveway and telling his young child that his father killed babies. Petitioner Treshman acknowledged that he had protested at Dr. Rosenfeld's residence within the year prior to trial. Dr. Edwards testified that picketers targeted his residence after the Convention more than a dozen times. He stated that the protesters came into his yard and driveway, yelled at his house and neighbors, played loud music, and used threatening words. Dr. Karpen testified that his home had been picketed several times and that the protesters trespassed onto his property during their demonstrations. Finally, petitioner Mahoney admitted having demonstrated at each of these physicians' residences, and claimed that he would continue to do so if the physicians continued performing abortions.

The buffer zones created by the permanent injunction are necessary to protect the

---

**70.** 853 S.W.2d 512 (Tex.1993).

**71.** 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

**72.** *Id.* at 487, 108 S.Ct. 2495 (citations omitted).

physicians' property rights and residential privacy. The zones certainly do not burden more speech than necessary to protect respondent physicians' privacy.

## V

■ Petitioners' last complaint concerns the award of punitive damages against them for, in the words of the jury charge, "maliciously engaging in a conspiracy to interfere with the business of Planned Parenthood." Petitioners argue that punitive damages cannot be assessed for conspiracy absent a finding of actual damages for conspiracy. The jury was instructed to find actual damages only for "conspiracy or wrongful interference", either one, not for conspiracy alone. Thus, petitioners argue, it cannot be determined from the verdict whether the jury found any actual damages for conspiracy or only for wrongful interference.

Petitioners concede that they did not make this argument to the trial court, either before or after the charge was submitted to the jury. Thus, their complaint has not been preserved.[73] Petitioners argue that the error in assessing punitive damages is fundamental and need not have been raised in the trial court. "Fundamental error exists 'in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas.'"[74] Awarding punitive damages without an unambiguous finding of actual damages is not fundamental error. Petitioners do not argue that awarding punitive damages against demonstrators is fundamental error because of the chilling effect it might have on free speech, and therefore we of course express no view on the subject.

## VI

We need respond only briefly to the separate opinions. We agree with JUSTICE SPECTOR, as we have already said, that protecting the health and safety of clinic patients is a compelling state interest justifying restrictions on the demonstrations. Where we disagree is over whether the evidence establishes that the presence of even peaceful "sidewalk counselors" in the buffer zones threatens patient health and safety. The evidence clearly shows a threat from the presence of several demonstrators or unrestricted activity in the buffer zones. We do not find sufficient evidence of threatened harm from the presence of as few as two demonstrators restricted to "sidewalk counseling", especially when a "sidewalk counselor" is required to withdraw at the patient's request. There is evidence that patients going to and from clinics often find it uncomfortable to discuss the subject of abortion, but as we have noted, the demonstrators' conduct, and not merely the subject of their speech, must threaten harm. Although we are sympathetic to the anxiety patients may feel in encountering demonstrators outside clinics, we simply cannot say that banning all demonstrators from the buffer zones burdens no more speech than necessary.

We disagree with JUSTICE GONZALEZ that requiring a "sidewalk counselor" to withdraw at a patient's request burdens speech more than necessary. Again as we have noted, the right to speak does not carry with it a duty to listen. Allowing patients to discontinue dialogue with "sidewalk counselors" should reduce the anxiety inherent in the encounter.

\* \* \* \* \*

We uphold the buffer zones protecting the residences of Dr. Kaminsky, Dr. Rosenfeld, Dr. Edwards, and Dr. Karpen because these protective zones do not burden more speech than necessary to protect the significant government interests enumerated by the trial court. Similarly, we leave intact the buffer zones protecting the Planned Parenthood Clinic, the Houston Women's Center, the West Loop Clinic, and the Women's Medical Center, but modify them so as to allow a limited number of demonstrators subject to certain restrictions. Only as modified do these buffer zones pass constitutional mus-

---

73. TEX.R.APP. P. 33.1(a) (formerly TEX.R.APP. P. 52(a)).

74. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 328 (Tex.1993) (quoting *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982)).

ter. The buffer zones protecting the AAA Concerned Women's Center, the A–Z Women's Clinic, the Suburban Women's Clinic, Aaron's Family Planning Clinic, the Downtown Women's Center, and Dr. Adesomo's residence, however, violate petitioners' constitutional rights of free expression.

The judgment of the court of appeals is modified to delete paragraphs E(3), E(4), E(6), E(8), E(9), and I(5) of the district court's injunction and to add paragraph E(10). As modified, the court of appeals' judgment is affirmed.

GONZALEZ, J., filed an opinion concurring in part and dissenting in part.

SPECTOR, J., filed an opinion concurring in part and dissenting in part, in which BAKER, J., joined.

SPECTOR, Justice, joined by BAKER, Justice concurring in part and dissenting in part.

For the most part, I concur in the Court's *judgment.* But the record before us demonstrates that the district court's permanent injunction burdened no more speech than necessary by barring all protest activity, including sidewalk counseling, within the designated buffer zones at the various clinics while allowing protesters on nearby sidewalks. *See Madsen v. Women's Health Ctr., Inc,* 512 U.S. 753, 776, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The Court's decision to allow Petitioners to perform sidewalk counseling within the buffer zones may well endanger clinic patients' health. Moreover, in modifying the injunction, the Court fails to consider the effect of boisterous, unpredictable, and occasionally violent nearby crowds on attempts at peaceful interaction. I respectfully dissent.

**I**

I strongly agree with the Court that the boundaries in free speech cases must not be *dictated* by the subject matter of the dispute. Instead, these cases require highly individualized decisions based upon the particular evidence presented by the parties. The absolute buffer zone was intended to do more than prevent "unjustifiable annoyance and obstruction." 975 S.W.2d at 556. Instead, there is evidence that the defendants' efforts to persuade clinic patients not to undergo abortions endangered patients' health. The Supreme Court has recognized that similar public health concerns may justify restrictions even on otherwise protected activities. *See Beth Israel Hosp. v. National Labor Relations Bd.,* 437 U.S. 483, 505, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978).

The record in this case contains ample evidence to support the conclusion that it was necessary to exclude all demonstrators, including sidewalk counselors, from the buffer zone in order to protect the significant governmental interest of protecting clinic patients' health and ensuring women safe access to medical services provided by the clinics. In the Court's own words,

> Some protesters ... acted as "sidewalk counselors", approaching people who drove or walked towards clinics and offering them anti-abortion literature. These encounters were often peaceful efforts to convey information in a helpful, persuasive way, but sometimes protesters were confrontational, coming within inches of patients' faces and shouting at them, causing respondents to have to provide "escorts" to shield patients from protesters.... Physicians reported increased respiration, heart rate, and blood pressure among [patients who encountered protesters], which at times required sedatives to treat.

975 S.W.2d at 550.

Ignoring the district court's *unchallenged* finding that "Defendants' aggressive and harassing manner of protesting and sidewalk counseling of clinic patients increases the medical risks attendant to the abortion procedure" and the evidence supporting that finding, the Court concludes that the ban on sidewalk counseling within the buffer zones is overbroad because it proscribes "peaceful conduct." *Id.* at 564. But the district court established an absolute buffer zone only after narrower restrictions in the temporary injunction failed to ameliorate the medical risks created by the defendants' tactics.

Judy Reiner, the director of one of the clinics, testified that sidewalk counselors "try

to block the patients from coming into the clinic.... I have seen on dozens and dozens of occasions women coming into our clinic literally shaking, crying, scared to death." One doctor testified that stress makes abortion a much more dangerous procedure, potentially causing seizures or even cardiac arrest. He also testified that stress was more likely to occur when patients have to traverse protesters. And contrary to the Court's assertion that no evidence indicated that "peaceful and unobtrusive" sidewalk counseling harmed patients, a psychologist testified that, against the backdrop of clinic protests, the mere presence of anti-abortion activists within the buffer zones, even silent ones, increased the stress experienced by clinic patients and personnel. All of this testimony was uncontroverted.

The Court, however, disregards this medical testimony. Instead, it gives great weight to the testimony of two sidewalk counselors, who testified that their activities were peaceful and unobtrusive. Both of these witnesses, however, denied any direct involvement with the defendants, and both admitted that they did not know how sidewalk counselors affiliated with Operation Rescue or Rescue America conducted their activities. More importantly, there was evidence that some counselors acting in concert with the defendants did "very aggressive so-called sidewalk counseling.... Blocking patients, yelling and screaming at patients, following them." This activity continued in the face of prohibitions in the temporary injunction barring that very conduct. On this record, the district court's conclusion that the exclusion of all sidewalk counselors from the buffer zones was necessary to minimize the medical risks to patients was more than reasonable.

The temporary injunction allowed up to four sidewalk counselors within the buffer zones, but prohibited counselors from yelling, shouting, or speaking louder than a normal speaking voice and from engaging in behavior intended or reasonably likely to intimidate or harass clinic patients. It also prohibited defendants from "inhibiting, impeding, obstructing or interfering with ... free and unmolested ingress and egress" to the clinics and from "touching, physically abusing, in-

timidating, or harassing any individual attempting to enter or exit" the clinics. The evidence in this case clearly establishes that those measures, along with a cease and desist provision, were ineffective. Nevertheless, the Court relies upon the same restrictions to protect the significant governmental interests threatened by the defendants' confrontational sidewalk counseling. 975 S.W.2d at 559, 562.

The other dissenting Justice takes the position that we cannot conclude that the measures in the temporary injunction were ineffective because "[t]he record does not show that efforts to enforce the temporary injunction overwhelmed police resources or that protestors were arrested for aggressively confronting patients." *Id.* at 582 (Gonzalez, J., concurring and dissenting). But, while the record does not clearly indicate that any of the defendants were arrested for violating the temporary injunction, several of the defendants were held in contempt for violating the temporary restraining order. And there is evidence that police were called to at least one clinic "on many, many, many occasions."

More importantly, I find it hard to believe that any jurist would take the position that a court cannot provide a remedy when there is evidence that the law has been violated, as there is in this case, simply because the record does not reflect that anyone has been arrested or that police resources have not been "overwhelmed." That position is particularly troubling when there is medical evidence, as in this case, that a violation could endanger women's lives. Unlike the labor cases cited by the other dissenting Justice, the absolute buffer zone in this case was intended to do more than insure unimpeded access or to shield clinic patients from speech that they may not wish to hear; it was intended to protect patients from the adverse medical consequences that might result from encounters with protesters.

Neither this Court nor the United States Supreme Court has ever denied the power of trial courts to expand injunctive relief when narrower restrictions prove ineffective, merely because no one has been arrested. To the contrary, the Supreme Court has emphasized the courts' power to modify injunctive relief

when the circumstances warrant it. "Each case must turn on its own circumstances. It is a case for the *flexible remedial power of a court of equity which may try one mode of restraint, and if it fails or proves to be too drastic, may change it.*" *American Steel Foundries v. Tri–City Cent. Trades Council,* 257 U.S. 184, 206, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (emphasis added).

In this case, the Court concedes that the district court was justified in banning protesters from the buffer zones because, "[g]iven that the temporary injunction's restrictions on sound levels had proved ineffective, the district court could resort to stronger measures." 975 S.W.2d at 563. The same rationale justifies the ban on sidewalk counseling within the buffer zones. *See Madsen,* 512 U.S. at 770, 114 S.Ct. 2516 ("We also bear in mind the fact that the state court originally issued a much narrower injunction, providing no buffer zone, and that this order did not succeed in protecting access to the clinic."). And in *Schenck v. Pro–Choice Network,* the Supreme Court considered abortion protesters' contention that a fixed buffer zone was unnecessarily broad because unchallenged provisions of the injunction at issue banned trespassing, excessive noise, and blocking or impeding access to facilities that performed abortions. 519 U.S. 357, 117 S.Ct. 855, 869, 137 L.Ed.2d 1 (1997). Mirroring the Court's position in this case, the protesters argued that "in light of these provisions, the only effect of a ban on 'demonstrating' within the fixed buffer zone is 'a ban on peaceful, nonobstructive demonstrations on public sidewalks or rights of way.'" *Id.* (quoting Petitioners' Brief at 47).

The Supreme Court was unpersuaded, observing that

> [t]his argument ... ignores the record in this case. Based on defendants' past conduct, the District Court was entitled to conclude that some of the defendants who were allowed within 5 to 10 feet of clinic entrances would not merely engage in stationary, nonobstructive demonstrations but would continue to do what they had done before.... The ban on 'blocking, impeding, and obstructing access' was therefore insufficient by itself to solve the problem,

and the fixed buffer zone was a necessary restriction on defendants' demonstrations. *Id.* Similarly, the record here belies the Court's conclusion that the complete buffer zone "burdened more speech than necessary by proscribing peaceful conduct." 975 S.W.2d at 563.

## II

The Court also errs by ignoring the effect that the presence of crowds of vociferous demonstrators outside of the buffer zone may have on sidewalk counselors' efforts to communicate peacefully. In *American Steel Foundries,* on which the other dissenting Justice heavily relies, the Supreme Court observed that a person's right to be free from "unjustifiable annoyance and obstruction" is not violated when another approaches and simply offers "to communicate and discuss information with a view to influencing the other's action." 257 U.S. at 204, 42 S.Ct. 72. The Supreme Court then explained, however, that attempts to communicate inoffensively assume an "aspect of intimidation" when large, unruly, and occasionally violent crowds gather. *Id.* Against such a backdrop, "[a]ll information tendered, all arguments advanced and all persuasion used ... were intimidation." *Id.* at 205, 42 S.Ct. 72. Accordingly, the Supreme Court crafted an injunction designed to prevent intimidation, as the district court did here. While the injunction in *American Steel Foundries* allowed a missionary, as the other dissenting Justice here notes, it also prohibited any other demonstrators from congregating at the plant or in the neighboring public streets in order "to prevent the inevitable intimidation of the presence of groups of pickets." *Id.* at 207, 42 S.Ct. 72. In contrast, as modified by this Court, the injunction here allows *both* missionaries *and* intimidating crowds.

## III

The district court's absolute buffer zone is entirely consistent with the Supreme Court's most recent decisions in this area. In *Schenck,* the Supreme Court struck down a floating buffer zone around people entering and leaving an abortion clinic. The Supreme Court noted that the floating buffer zone

prevented the defendants from "communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on public sidewalks." *Schenck*, 117 S.Ct. at 867. The Supreme Court struck down that prohibition because of the difficulty protesters would face in attempting to comply with the injunction in light of the configuration of the sidewalks around the clinics:

> Protesters could presumably walk 15 feet behind the individual, or 15 feet in front of the individual while walking backwards. But they are then faced with the problem of watching out for other individuals entering or leaving the clinic.... With clinic escorts leaving the clinic to pick up incoming patients and entering the clinic to drop them off, it would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction. This *lack of certainty* leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits.... *Since there may well be other ways to both effect such separation and yet provide certainty (so that speech protected by the injunction's terms is not burdened)*, we conclude that the floating buffer zones burden more speech than necessary to serve the relevant governmental interests.

*Id.* at 867–68 (footnotes omitted). In other words, a permissible injunction may be crafted to separate protesters, including sidewalk counselors, from clinic patients, so long as the required separation is clearly defined. The fixed buffer zone in this case comports with that standard.

Other portions of *Schenck* suggest that the injunction's absolute buffer zone is consistent with the First Amendment. In upholding a fixed buffer zone, the Court noted that

> [t]he fact that the injunction allows two sidewalk counselors into the fixed buffer zones ... does not detract from [the conclusion that the only way to ensure access was to move all protesters away from clinic doorways]. It is clear from the District Court's opinion that its decision to allow two sidewalk counselors inside the buffer

zones was an effort to bend over backwards to "accommodate" defendants' speech rights. *Because the District Court was entitled to conclude on this record that the only feasible way to shield individuals within the fixed buffer zone from unprotected conduct*—especially with law enforcement efforts hampered by defendants' harassment of the police—*would have been to keep the entire area clear of defendant protesters, the District Court's extra effort* to enhance defendants' speech rights by allowing an exception to the fixed buffer zone should not redound to the detriment of respondents.

*Id.* at 868 n. 11 (emphasis added).

\* \* \*

Based upon the evidence in this case, the injunction properly defined the boundary between the defendants' free speech rights and the significant governmental interests the plaintiffs sought to protect. The line drawn by the district court is "designed to limit no more than the very evil of 'in-your-face' harassment shown by the evidence at trial." 937 S.W.2d 60, 83. Accordingly, I dissent.

GONZALEZ, Justice, concurring in part and dissenting in part.

The pivotal issue that divides this Court is whether an individual may approach a woman seeking an abortion to leaflet or make a personal appeal to consider alternatives to abortion without significant risk of arrest and prosecution. The Court's modification of the injunction permits two sidewalk counselors to enter the buffer zones around four clinics but forces them to stop counseling and retreat (i.e., "cease and desist") when the woman seeking an abortion states a desire to be left alone. I concur insofar as the judgment does not presumptively prohibit peaceful sidewalk counseling. However, I dissent with respect to the "cease and desist" provision, because it chills protected speech far beyond that necessary to accomplish the injunction's legitimate goals.

It is difficult in any First Amendment case to entirely divorce one's personal views of the message conveyed from the speaker's constitutional right to convey it. My views on

when life begins and abortion are well known. *See Nelson v. Krusen,* 678 S.W.2d 918, 935 (Tex.1984) (Gonzalez, J., concurring and dissenting); *Krishnan v. Sepulveda,* 916 S.W.2d 478, 484–85 (Tex.1995) (Gonzalez, J., dissenting); *Edinburg Hosp. Auth. v. Trevino,* 941 S.W.2d 76, 86–87 (Tex.1997) (Gonzalez, J., dissenting). I believe that a human being is created at the moment of conception, and that abortion is the taking of a human life. I acknowledge that those with opposite views are just as passionate in their belief. But as hard as it may be, we must constantly remind ourselves that this case is not about the relative merits of pro- and anti-abortion viewpoints; this case is about the First Amendment right of free speech that happened to arise in the context of abortion picketing. Whenever the subject of abortion comes up tangentially to another issue, it tends to monopolize and distort the discussion. I fear Justice O'Connor's observation is correct:

> This Court's abortion decisions have already worked a major distortion in the Court's constitutional jurisprudence. Today's decision goes further, and makes it painfully clear that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion.

*Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 814, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting). We must be ever vigilant that we not allow this issue, which has polarized the country, to subvert constitutional guarantees. What we say today should apply tomorrow equally to persons on either side of the abortion issue, workers demonstrating for better conditions, and political picketers of all stripes.

With that in mind, I turn now to put the issues in context by reviewing some important facts. The record indicates that many different groups and individuals, some strident, others peaceful and prayerful, demonstrated at respondents' abortion clinics. Some of the activities, such as the blockades and sit-ins, were the result of petitioners' concerted activities, and this laid the predi-

cate for the trial court's injunction. However, the testimony of two key witnesses and recent judicial experience shows that the trial court's injunction—barring all "demonstrating," including sidewalk counseling, within designated buffer zones—unnecessarily chills peaceful moral suasion by non-parties. The tradition of our nation's courts to carefully tailor anti-picketing injunctions to allow a few "missionaries" within otherwise speech-free buffer zones and the Texas Constitutional mandate to use "least restrictive means" require that our courts be exacting when crafting speech-restrictive injunctions. The offending conduct here can easily be addressed without abrogating all peaceful sidewalk counseling.

I

Janet Hafernik and Mary Hall Kleypass testified that they offered "sidewalk counseling" at the Planned Parenthood clinic, the Houston Women's Clinic, and the West Loop Clinic—three of the four clinics in which we uphold the buffer zones—during the same time period petitioners conducted their demonstrations. Hafernik and Kleypass conducted these activities for four and six years, respectively, one or two times a week. Kleypass described her efforts as follows:

Q. [W]hen you engage in sidewalk counseling would you describe for the Court what you do or did at that time?

A. Yes. I approach the woman coming in and extend to her help and assistance. I have literature with me that is information about the development of the baby as well as a place where she could go for help. And I tell her that I care about her, that I want to help her and give her information that she is not going to get in the abortion clinic.

. . . .

Q. Let me ask you this, in sidewalk counseling, is intim[id]ating the woman you're talking to a factor in sidewalk counseling?

A. It's absolutely the opposite of what we would try to do. When I talked to people in training them to be sidewalk counselors, I stress to them the importance of our demeanor, our approach to be

gentle, our eye contact, our nonverbal cues, everything we do is gentle and inviting. We don't carry signs or yell or scream. The object is to love the woman. You can't love the woman with all that other stuff.

. . . .

Q. Just for the record and for the Court's information, specifically, what do you say to a woman who is a stranger to you when you approach her on the sidewalk in front of an abortion facility?

A. I say, Hello. May I give you some information that you are not going to receive in there? I have information to help you. We have alternatives. We have assistance, financial, medical, housing, clothing, food, whatever you would need, and I have some information on the development of your baby that they will also not give you in the abortion facility.

Janet Hafernik offered similar testimony about her activities. On cross-examination, she indicated that she did not harass patients who did not want to talk:

Q. When you're outside a clinic, you don't yell at patients, right?

A. Right.

Q. Why is that?

A. Because basically, when you yell, you scare the women. They're already nervous going in.

Q. And you don't think it's right to try and scare someone to make them do what you want them to do?

A. No, it's got to come out of love.

Q. You don't try to physically restrain women from going into a clinic?

A. Right.

Q. You do sometimes take them by the arm?

A. Yes, if they're agreeable to that.

Q. Okay. Do you walk along side them?

A. Sometimes, but usually you're just kind of standing in a small area. Sometimes you have to walk to get out of the way of cars coming in or something.

Q. If a woman coming into a clinic indicates to you—I believe you said some

women are very angry that you're there and don't want to hear what you have to say; is that right?

A. True.

Q. When those women are angry and don't want to hear what you have to say, do you allow them to walk on unmolested?

A. Yes.

Both Kleypass and Hafernik testified that they could not effectively sidewalk counsel without direct interaction with the patient:

Q. When you conduct sidewalk counseling, where do you go on the public sidewalk typically?

A. Typically at the point where the person would enter, and if they're coming in a car, I [Kleypass] approach the car on the side and hold out my information. If they're walking, I do the same thing, and I will smile and offer it to them.

Q. Could you sidewalk counsel from across the street of an abortion facility?

A. I would not call that sidewalk counseling, because it would not be able to include the interaction between the girl and myself. It would be more of a yelled appeal than it would counseling.

Q. Can you sidewalk counsel by shouting?

A. That wouldn't be sidewalk counseling. I suppose that you can make your opinion known or offer help, but that wouldn't be counseling, because you would be missing the interactiveness of an encounter one on one.

Q. Well, why don't you just stand across the street and offer sidewalk counseling to them?

A. Like I said, you can offer help, you cannot really counsel. Counseling is done one on one. . . .

Q. In order to successfully sidewalk counsel, what, if any, factor, is your initiating the conversation?

A. That is very important, because the women sometimes have been told things about us or about others that aren't true. A lot of times they're upset, their heads are down, and they are closed off. A gentle voice saying, Hi, can I help you,

is a very important way in helping them to look up and interact.

. . . .

Q. Why can't you just hold [a] sign up across the street expressing your opposition to abortion?

A. I could, but again, that would not be sidewalk counseling.

Kleypass's and Hafernik's sidewalk counseling activities were fairly well-received. Hafernik testified that approximately half the women were willing to talk or take her literature, that many were interested in her information, and that she successfully persuaded as many as one out of every ten women she counseled to choose an alternative to abortion. Respondents made no effort to controvert the testimony of Kleypass or Hafernik.

## II

The dissent believes that we should give little weight to the testimony of Kleypass and Hafernik, because both witnesses denied direct involvement with petitioners. *See* 975 S.W.2d at 570 (Spector, J., dissenting). Indeed, for the purposes of obtaining the injunction, respondents made no effort to characterize Kleypass or Hafernik as acting in concert with petitioners. But respondents needed rather little evidence to accuse other individuals of conspiring with petitioners. Persons who gave one of the named defendants a ride from the airport, attended an anti-abortion conference or seminar at which one or more defendants were present, owned one of defendants' T-shirts, bumper stickers, or other publications, or had their activities announced or recommended by one of the defendants were accused of acting in concert. In short, any contact, association or relationship with, or recommendation by a defendant was useful evidence of conspiracy. Allegations of conspiracy have long been used as a bludgeon against the First Amendment and a dragnet to suppress sympathizers of politically unpopular movements. *See, e.g., Whitney v. California*, 274 U.S. 357, 365–72, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (sustaining conviction of member of Communist Labor Party, which had adopted resolution advocating violent revolution even though defendant had presented a resolution advocating peaceful means).

The danger that all pro-life demonstrators will be indiscriminately lumped together with petitioners is illustrated by the testimony of Judy Reiner, a Planned Parenthood abortion clinic director:

Q. Is it possible that any pro-lifer in Houston, Texas, goes out and protests on a regular basis whether it be outside Planned Parenthood or be it in a residential picket without getting instructions from Rescue America or Operation Rescue National?

A. I don't believe the individuals who come to Planned Parenthood or who are at various specific times in front of doctors' houses are doing this independently, no. I do believe they are working in concert with Operation Rescue and Rescue America.

. . . .

Q. Is it your testimony that no one goes to a clinic unless they have been asked to go to the clinic by Operation Rescue or Rescue America or one of my seven defendants?

A. It's very obvious that demonstrations are organized, that people are not appearing spontaneously. So in that respect, yes.

. . . .

Q. What are the criteria that you utilize for determining whether or not someone is an operative of Operation Rescue or of my seven or of Rescue America?

A. I think it's very obvious from the tapes of certain individuals, including the individuals that you represent, are in fact the leadership or providing direction, and I guess if you want to say those people are operatives, they are operatives of those two organizations. They clearly represent their goal, and they clearly use their tactics.

Reiner's testimony raises a troubling question: what kinds of associations, incidental or deliberate, can there be between a nonparty and petitioners before the nonparty will be branded as acting in concert and burdened by the injunction's provisions? In *Elfbrandt*

*v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), the Supreme Court asked a similar question on behalf of state employees whose job security was jeopardized by ties with communist organizations:

> People often label as "communist" ideas which they oppose; and they often make up our juries. "[P]rosecutors too are human." Would a teacher be safe and secure in going to a Pugwash Conference? Would it be legal to join a seminar group predominantly Communist and therefore subject to control by those who are said to believe in the overthrow of the Government by force and violence? Juries might convict though the teacher did not subscribe to the wrongful aims of the organization. And there is apparently no machinery provided for getting clearance in advance.

*Id.* at 16–17, 86 S.Ct. 1238 (citations and footnotes deleted). Similarly, in *Noto v. United States,* 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961), the Court warned:

> [T]here is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.

*Id.* at 299–300, 81 S.Ct. 1517. There is a similar risk that the speech of nonviolent pro-life demonstrators will be suppressed by accusing them of having ties with the violent elements of the anti-abortion movement.

Even if no attempts are made to link Kleypass, Hafernik, or other non-parties with petitioners, their activities are still gravely burdened by a speech-free injunction against petitioners. It is difficult for law enforcement officers to know, in advance, who is and is not acting in concert. Not surprisingly, similar injunctions involving absolute buffer zones have been enforced against all pro-life demonstrators, regardless of the demonstrators' affiliation with the defendants in the original injunction proceeding. *See, e.g., Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 795–97, 815–20, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (Scalia, J., concurring and

dissenting); *Cheffer v. McGregor,* 6 F.3d 705, 707, 710–11 (11th Cir.1993), *vacated,* 41 F.3d 1422 (11th Cir.1994) (en banc) (per curiam) (remanded for reconsideration in light of *Madsen* ); *Hoover v. Wagner,* 47 F.3d 845, 846–47, 850–51 (7th Cir.1995); *McKusick v. City of Melbourne,* 96 F.3d 478, 484–86 (11th Cir.1996); *Gottfried v. Medical Planning Servs., Inc.,* 142 F.3d 326, 328 (6th Cir.1998) (all recounting incidents in which pro-life demonstrators acting independently of the parties subject to the underlying injunction were arrested or chilled by the threat of arrest). As these cases illustrate, to ignore the chilling effect of the injunction on non-parties "screens reality" and is inconsistent with First Amendment jurisprudence. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 924, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). We must "not hesitate[ ] to take into account possible applications of the [injunction] in other factual contexts besides that at bar." *NAACP v. Button,* 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

In *McKusick,* the city attorney defended Melbourne's practice of arresting *all* anti-abortion protestors found within the *Madsen* 36–foot buffer zone:

> We can only enforce the injunction by bringing before the court those persons who by their objective behavior, do certain things that we believe are violative of the injunction. The City of Melbourne cannot decide whether or not they intended to support them or whether or not they were members of Operation Rescue. These people do not wear badges saying, "I'm with Operation Rescue" when they're picketing and protesting out there.

*McKusick,* 96 F.3d at 484. The *Hoover* and *McKusick* courts denied these non-parties any relief on grounds of federalism and comity, leaving the non-parties in a catch–22: forego their First Amendment right to demonstrate or suffer probable arrest. *See Hoover,* 47 F.3d at 850–52; *McKusick,* 96 F.3d at 488–89. These cases illustrate the difficulty of undoing an injunction's unintended chilling effects once it becomes final.

The injunction may chill a large gathering of peaceful picketers, unaffiliated with defendants, from congregating within the buffer

578

zone. While I am troubled by this, the chilling effect is less objectionable because the injunction allows a few persons, without significant threat of arrest, to approach others peacefully in an attempt to leaflet or engage in moral suasion. The sidewalks across the street give the remaining demonstrators an effective alternative forum for communicating their message to broader audiences (e.g., the media or the driving public). *But see Schneider v. Town of Irvington,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). But the dissent would impose an intolerable burden on speech by deterring all sidewalk counselors from entering the buffer zone. This would prevent any effective means of communicating with the only person whose opinion about abortion makes any difference in the end— the clinic patient.

### III

The dissent argues that an absolute buffer zone is justified because even peaceful interactions with patients may be stressful, consequently endangering their health. The State's legitimate interest in the physical health and safety of clinic patients may justify numerical limitations and noise restrictions to minimize the stress likely to be produced by yelling, shouting, crowding, and touching. *See, e.g., Kovacs v. Cooper,* 336 U.S. 77, 86–87, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (restricting sound amplification in residential neighborhoods). That interest does not, however, justify criminalizing peaceful, face-to-face pro-life appeals because they may stress a patient by exacerbating her moral anxiety about having an abortion. *See Madsen,* 512 U.S. at 773–74, 114 S.Ct. 2516

(declining to extend reasoning of *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 684, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), which upheld a prohibition on face-to-face solicitation in airport terminals, in striking down provision prohibiting uninvited approaches within 300 feet of clinic).

The State does not have a legitimate interest in prohibiting speech because the content of the message is emotionally upsetting or causes psychological harm. "The emotive impact of speech on its audience is not a 'secondary effect.'" *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *see also Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (noting the Court's "longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience"). "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). "As a general matter ... citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos,* 485 U.S. at 322, 108 S.Ct. 1157 (internal quotation marks omitted), *quoted approvingly in Madsen,* 512 U.S. at 774, 114 S.Ct. 2516.

I concede that moral confrontation, and even the mere presence of anti-abortion demonstrators in the vicinity of the clinics, will be emotionally upsetting.[1] However, that cannot justify keeping pro-life speech out of sight and out of mind. In *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), Justice Stevens distinguished speech

1. Dr. Rosenfeld, a doctor who performs abortions, testified that most patients already experience moral anxiety about having abortions:

   Q. All right. Doctor, on the stress that you've testified about of patients, isn't it true that a lot of them are under stress because of what they're about to do, in other words, the termination procedure itself?
   A. That's correct. And a lot of them—in fact, there have been multiple studies that show that indeed the vast majority of patients

are very stressful about it and they do feel—have some considerable guilt about it, and these people just add to that stress and add to this preexisting, that even when they're not there there's concern, and even when they're not there, if there's any question, we always have the patient come back some other time, that there is no difference in getting an abortion done one day as opposed to three days later or five days later.

offensive because of its form from speech offensive because of its content:

> [A] communication may be offensive in two different ways. Independently of the message the speaker intends to convey, the form of his communication may be offensive—perhaps because it is too loud or too ugly in a particular setting. Other speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message. The fact that the offensive form of some communication may subject it to appropriate regulation surely does not support the conclusion that the offensive character of an idea can justify an attempt to censor its expression.

*Id.* at 546–48, 100 S.Ct. 2326 (Stevens, J., concurring). Similarly, a demonstrator's speech may be *stressful* in different ways. It may be stressful because the demonstrator shouts, crowds, or touches the patient. Alternatively, as is sometimes the case with sidewalk counseling, the speech may be stressful because it increases the woman's anxiety and guilt about her consent to the killing of her baby. Restrictions may not be imposed against peaceful forms of communication that induce stress only because of the moral *content* of the message.

The Court's solicitude for the health and well-being of clinic patients is reflected in many of the injunctive provisions it upholds. The Court severely restricts petitioners' means and methods of communicating their opposition to abortion, both inside and outside the buffer zones. Clinic access is preserved by "restraining the *troublesome* mass of protestors to a location across the street." *See Horizon Health Ctr. v. Felicissimo,* 135 N.J. 126, 638 A.2d 1260, 1273 (1994) (emphasis added). "Aggressive" confrontations with patients are eliminated by the prohibitions against shouting, yelling, touching, and physical abuse. Incidentally, some of the injunctive restrictions on the *form* of communications approved here would be constitutionally suspect in other contexts. *See Ex Parte Tucker,* 110 Tex. 335, 220 S.W. 75, 76 (1920) ("There can be no liberty in the individual to speak, without the unhindered right to speak.

It cannot co-exist with a power to compel his silence or fashion the form of his speech."); *Claiborne Hardware,* 458 U.S. at 928, 102 S.Ct. 3409 ("Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals....").

In *Ex Parte Tucci,* 859 S.W.2d 1, 8 (1993), we struck down the one-hundred foot buffer zones around the clinics contained in the district court's temporary restraining order. The plurality opinion warned that if we rejected the "least restrictive means" test, it would permit "rather substantial adverse effects on speech if masked as directed to some purported goal other than suppression." 859 S.W.2d at 7–8 (Doggett, J., plurality opinion). The controversy over sidewalk counseling underscores the necessity of using "least restrictive means" in order to avert suppression. Today the Court adopts *Madsen*'s "burden no more speech than necessary" test as its own on the understanding that it incorporates both *Tucci*'s "least restrictive means" test and *Claiborne Hardware*'s requirement of precision of regulation. This standard mandates the Court's modification of the injunction to allow limited, peaceful sidewalk counseling.

Given the record and subject matter of this case, it is appropriate to remember the United State Supreme Court's admonition in *NAACP v. Button* during a time of fierce and widespread opposition to the civil rights movement:

> We cannot close our eyes to the fact that the militant Negro civil rights movement has engendered the intense resentment and opposition of the politically dominant white community.... In such circumstances, a statute broadly curtailing group activity ... may easily become a weapon of oppression, however evenhanded its terms appear. Its mere existence could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens.

371 U.S. at 435–36, 83 S.Ct. 328. The same is true today; only the actors and issues are different.[2]

---

2. To paraphrase Justice Brennan, we cannot

close our eyes to the fact that the pro-life move-

## IV

Sidewalk counseling is unlike other modes of political expression. Picketing, sit-ins, and street marches are typically utilized to attract media attention and stimulate public discussion of a political issue. The speech of a sidewalk counselor, by contrast, does not seek the public's attention or promote a political solution to the abortion issue. Rather, a sidewalk counselor directs her message to a very limited audience—the clinic patient— seeking to persuade her to choose a life-affirming alternative to abortion.

The testimony of Kleypass shows that forcing sidewalk counselors across the street would significantly impair these activities. The opportunity they have to hold a sign or wear a pro-life T-shirt across the street is not an adequate alternative to sidewalk counseling. "[T]he most effective, fundamental, and perhaps economical avenue of political discourse [is] direct one-on-one communication." *Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). "In a face-to-face encounter there is a greater opportunity for the exchange of ideas and the propagation of views...." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 798, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "Feelings and opinions are recruited, the heart is enlarged, and the human mind is developed, only by the reciprocal influence of men upon each other." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 200 (Richard D. Heffner ed., New American Library 1956) (1840).

In several opinions spanning the major political movements of the twentieth century, the Supreme Court has vindicated the right of activists to pursue converts through personal confrontation and focused moral suasion. *See, e.g., American Steel Foundries v. Tri-City Cent. Trades Council,* 257 U.S. 184, 206–07, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (recognizing the right of labor representatives to confront strike-breakers as they attempted to enter or exit the plant); *Martin*

*v. City of Struthers,* 319 U.S. 141, 145–49, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (striking down application to religious proselytizing of ordinance prohibiting door-to-door solicitation); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 416–20, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (upholding the right of neighborhood activists to organize community pressure against real estate agent who promoted white flight for private gain); *Claiborne Hardware,* 458 U.S. at 910, 102 S.Ct. 3409 ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action.").

More than three quarters of a century ago, the United States Supreme Court vindicated the right of labor picketers to send "missionaries" to plant entrances despite the fact that many picketers had physically abused workers attempting to enter or exit the plant. *See American Steel Foundries v. Tri–City Cent. Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921). Over a period of three weeks, picketers assaulted and wounded several employees attempting to enter a large steel manufacturing plant. *See id.* at 197–200, 42 S.Ct. 72. Several employees slept in the plant for a week to avoid the violence. *Id.* at 200, 42 S.Ct. 72. Others so feared attack that they abandoned work. *Id.* The Court summarized the "attitude" of the demonstrations as follows:

It is idle to talk of peaceful communication in such a place and under such conditions. The numbers of the pickets in the groups constituted intimidation. The name "picket" indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work, one of running a gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued, they characterized the whole campaign, which became effective because of its in-

---

ment has engendered the intense resentment and opposition of the abortion industry and powerful segments of society. In such circumstances, an injunction broadly curtailing peaceful picketing and court proceedings to enforce the "in concert" provision could easily become a weapon of oppression, however evenhanded the injunction's terms appear. The mere existence of an absolute buffer zone could well freeze out of existence all interpersonal moral suasion on behalf of the unborn.

timidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere.

*Id.* at 205, 42 S.Ct. 72. The district court issued a restraining order enjoining the defendants "from picketing or maintaining at or near the premises of the complainant, or on the streets leading to the premises of said complainant, any picket or pickets." *Id.* at 194, 42 S.Ct. 72.

Nevertheless, the United States Supreme Court reversed the restraining order's complete prohibition on picketing as violating Section 20 of the Clayton Act. That section declared, in pertinent part, that:

> no such restraining order or injunction shall prohibit any person or persons ... from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working.

*Id.* at 202, 42 S.Ct. 72. The Supreme Court asked the pivotal question which we again face today:

> *How far may men go in persuasion and communication and still not violate the right of those whom they would influence?* In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. *We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights.* If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free.

*Id.* at 204, 42 S.Ct. 72 (emphasis added). The Court then crafted the following balance between the rights of the employees and the rights of the picketers:

> We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress and egress in the plant or place of business and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant, that such representatives should have the right of observation, communication and persuasion but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion obstruct an unwilling listener by importunate following or dogging his steps.... *The purpose should be to prevent the inevitable intimidation of the presence of groups of pickets, but to allow missionaries.*

*Id.* at 206–07, 42 S.Ct. 72 (emphasis added).

*American Steel Foundries* cannot be distinguished on the ground that the Court considered only section 20 of the Clayton Act, and not freedom of speech. The Court repeatedly emphasized that section 20:

> introduces no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize this rule of action and render it uniform.

*Id.* at 203, 42 S.Ct. 72; *see also id.* at 206, 42 S.Ct. 72 ("[W]e must have every regard to the congressional intention manifested in the act *and to the principle of existing law which it declared* ....") (emphasis added); *Senn v. Tile Layers Protective Union,* 301 U.S. 468, 478, 57 S.Ct. 857, 81 L.Ed. 1229 (1937) ("Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution."). Later Supreme Court opinions have been even stronger in endorsing

the right of peaceful picketing. *See, e.g., Bakery & Pastry Drivers & Helpers Local 802 v. Wohl*, 315 U.S. 769, 775, 62 S.Ct. 816, 86 L.Ed. 1178 (1942) (reversing an injunction against peaceful picketing); *Claiborne Hardware*, 458 U.S. at 910, 102 S.Ct. 3409 (reversing damages award and injunction against "store watchers," although record was replete with intimidation, stating that "[s]peech does not lose its protected character ... simply because it may embarrass others or coerce them into action").

Since *American Steel Foundries*, it has been a common practice of our nation's courts, when fashioning picket-restrictive injunctions, to allow a limited number of pickets within otherwise speech-free buffer zones. *See, e.g., United Mine Workers v. Bagwell*, 512 U.S. 821, 823, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (not prohibiting but limiting the number of pickets); *United Auto., Aircraft & Agric. Implement Workers v. Wisconsin Employ. Relations Bd.*, 351 U.S. 266, 269–70 n. 3, 275, 76 S.Ct. 794, 100 L.Ed. 1162 (1956) (affirming order "[l]imit[ing] the number of pickets around the Kohler Company premises to a total of not more than 200, with not more than 25 at any one entrance"); *United Farm Workers v. H.E. Butt Grocery Co.*, 590 S.W.2d 600, 602–06 (Tex.Civ.App.—Corpus Christi 1979, no writ) (affirming but modifying picketing injunction that allowed leafletting); *Sabine Area Bldg. Trades Council v. Temple Assocs., Inc.*, 468 S.W.2d 501, 501–02 (Tex.Civ. App.—Beaumont 1971, no writ) (affirming anti-picketing injunction that allowed no more than two pickets within fifty feet of the entrance site); *Emhart Indus., Inc. v. Amalgamated Local Union 376*, 190 Conn. 371, 461 A.2d 422, 425 (1983) (affirming, as modified, injunction that prohibited only *mass* picketing); *Johnson Bros. Wholesale Liquor Co. v. United Farm Workers Nat'l Union*, 308 Minn. 87, 241 N.W.2d 292, 299 (1976) (holding that injunction limiting pickets to three per entrance was reasonable); *Westinghouse Elec. Corp. v. United Elec., Radio & Machine Workers Local 601*, 353 Pa. 446, 46 A.2d 16, 22 (1946) (prohibiting *mass* picketing after union used pickets to blockade entrances to plants); *Arnault v. Bryant*, 179 N.E.2d 173, 176 (Ohio Com.Pl.1961) (limiting picketing to one at a time).

The Supreme Court and our own state courts have reaffirmed the principle announced in *American Steel Foundries* in reviewing the constitutional validity of anti-picketing statutes. *See Thornhill v. Alabama*, 310 U.S. 88, 99, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (striking down anti-picketing statute because, among other defects, it "le[ft] room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character [of their discourse]"); *Geissler v. Coussoulis*, 424 S.W.2d 709, 712 (Tex.Civ.App.— San Antonio 1967, writ ref'd n.r.e.) (upholding statute permitting no more than two pickets within fifty feet of the entrance of any business because the allowance of two pickets allowed group to "communicate their message to all persons who attempt to enter the [business], be they prospective customers, employees or suppliers"); *but see Olvera v. State*, 806 S.W.2d 546, 552 (Tex.Crim.App. 1991) (striking down the state's anti-picketing statute as facially overbroad even with its allowance of two picketers).

The dissent believes that a complete prohibition on sidewalk counseling is further justified because the district court found that the temporary injunction, which allowed up to four sidewalk counselors within the buffer zones, was ineffective. *See* 975 S.W.2d at 571. But the record does not support the dissent's view that the temporary injunction was ineffective. The record does not show that efforts to enforce the temporary injunction overwhelmed police resources or that protestors were arrested for aggressively confronting patients. *Compare Claiborne Hardware*, 458 U.S. at 903, 102 S.Ct. 3409 ("The police made no arrests—and no complaints are recorded—in connection with the picketing and occasional demonstrations supporting the boycott."), *with Schenck v. Pro-Choice Network*, 519 U.S. 357, 117 S.Ct. 855, 860, 137 L.Ed.2d 1 (1997) (observing that efforts to enforce the temporary injunction were ineffective and overwhelmed police resources).

It does not matter that enforcing a qualified buffer zone may be more difficult than enforcing an absolute buffer zone. "[T]he argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen." *Ex Parte McCormick,* 129 Tex. Crim. 457, 88 S.W.2d 104, 107 (1935); *accord Ex Parte Tucci,* 859 S.W.2d at 6. Every effort should be made to hold individual offenders responsible for their deeds before burdening the speech of peaceful pro-life advocates such as Hafernik and Kleypass. *See Claiborne Hardware,* 458 U.S. at 920, 933, 102 S.Ct. 3409 (urging that individual offenders, rather than the whole group of boycott participants, should be held responsible for their violent deeds).

The dissent would set an astonishingly low threshold for triggering more severe speech prohibitions. It apparently believes that contempt convictions for violations of the trial court's *temporary restraining order,* which convictions we overturned in *Ex Parte Tucci,* 859 S.W.2d 1 (1993), and which violations preceded the imposition of the trial court's *temporary injunction,* justified the trial court's finding that the *temporary injunction* was ineffective and sterner anti-speech measures were needed. *See* 975 S.W.2d at 572. The Court properly sets a high threshold for triggering greater speech restrictions, lest any alleged unproven violation serve as a pretext for burdening more speech than necessary.

### V

While I concur with the Court's allowance for peaceful sidewalk counseling, I dissent with respect to the provision forcing a sidewalk counselor to stop and retreat when a targeted person announces a desire to be left alone. I recognize that the Supreme Court upheld a similar provision in *Schenck. See* 117 S.Ct. at 868 (holding that the "cease and desist" provision was acceptable because "the District Court was entitled to conclude ... that the only way to ensure access was to move *all* protestors away from the doorways"). However, I find *Schenck*'s reasoning unpersuasive because its conclusion was

grounded on an analysis that lacked the benefit of full briefing by the parties. *See* 117 S.Ct. at 873 (Scalia, J., dissenting) ("The Court's effort to recharacterize that responsibility of special care imposed by the First Amendment as some sort of judicial gratuity is perhaps the most alarming concept in [the] opinion. . . .").

I would hold that such a provision violates the free speech guarantee of article I, section 8 of the Texas Constitution. The cease and desist provision elevates the right "to be left alone" above the "freedom of speech," and means that a sidewalk counselor can be muzzled before she utters the first word of her appeal. The fact that this burdens more speech than necessary is plainly illustrated by Kleypass's testimony:

Q. What do you do if the women don't appear interested in hearing what you have to say?

A. Well, I appeal to them to take my written information, because many of the women do not want to have conversations, in which case I ask them just to consider the brochures that I have, and I just ask them to take it, and then I leave them alone.

. . . .

Q. Based upon your own knowledge and experience, have there been women who you approached who initially did not want to hear your message and ultimately changed their mind and decided not to have an abortion?

A. Yes. We have had many women who have been very hostile or acted irritated in the beginning, and later came back or turned around right then and there when they felt like I had nothing to gain from them, they really understood that I cared about them, then they became open. And to make a long story short, they felt pressured into having the abortion and when an alternative was provided to them, they took it and did not abort.

I think that it is enough that the injunction prohibits harassment, which would allow the tactful persistence illustrated by Kleypass's testimony.

**584**

The "cease and desist" provision, like the no-approach-unless-invited zone that *Madsen* struck down, *see Madsen,* 512 U.S. at 774, 114 S.Ct. 2516, places the speaker's freedom to communicate at the mercy and consent of the audience. Long ago, the Court recognized that it is no less constitutionally infirm for freedom of speech to be subsequently revoked than initially withheld:

> To say that he who is free to withhold at will the privilege of publication exercises a power of censorship prohibited by the Constitution, but that he who has unrestricted power to withdraw the privilege does not, would be to ignore history and deny the teachings of experience, as well as to perpetuate the evils at which the First Amendment was aimed.

*Jones v. City of Opelika,* 316 U.S. 584, 602, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942) (Stone, C.J., dissenting), *adopted per curiam on reh'g,* 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290 (1943).

## VI

I have one final point to make. The court of appeals below cited several incidents of vandalism and aggression that occurred during the period of time petitioners staged their demonstrations at Houston-area abortion clinics. *See* 937 S.W.2d 60, 74–77. The argument that the end justifies the means is "a rule of conduct denounced by all law, human and divine, as being pernicious in policy and false in morals." *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 76, 18 L.Ed. 281 (1866). Such incidents have strained the patience of the public and of the justice system almost to the breaking point. Every intimidating gesture or hateful utterance deafens the public's collective ear to pro-life appeals about the dignity of the unborn. Every act of anti-abortion violence or clinic vandalism devastates the moral credibility of the pro-life message. Petitioners and other anti-abortion protestors would do well to heed Abraham Lincoln's admonition regarding the importance of public sentiment:

> *With* it, nothing can fail; *against* it, nothing can succeed. Whoever moulds public sentiment, goes deeper than he who enacts statutes, or pronounces judicial decisions.

He makes possible the inforcement of these, else impossible.

George McKenna, *On Abortion: A Lincolnian Position,* ATLANTIC MONTHLY, Sept. 1995, at 51, 61. Petitioners, therefore, should be wary of the harm that anti-abortion violence and clinic vandalism does to the peaceful advocates of their cause.

For all of the above reasons, I concur in part and dissent in part.